# PENNSYLVANIA v. MUNIZ

No. 89–213.   Argued February 27, 1990—Decided June 18, 1990

BRENNAN, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III–A, and IV, in which REHNQUIST, C. J., and WHITE, BLACKMUN, STEVENS, O'CONNOR, SCALIA, and KENNEDY, JJ., joined, the opinion of the Court with respect to Part III–B, in which MARSHALL, O'CONNOR, SCALIA, and KENNEDY, JJ., joined, and an opinion with respect to Part III–C, in which O'CONNOR, SCALIA, and KENNEDY, JJ., joined. REHNQUIST, C. J., filed an opinion concurring in part, concurring in the result in part, and dissenting in part, in which WHITE, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 606. MARSHALL, J., filed an opinion concurring in part and dissenting in part, *post*, p. 608.

*J. Michael Eakin* argued the cause and filed a brief for petitioner.

*Richard F. Maffett, Jr.*, argued the cause and filed a brief for respondent.*

JUSTICE BRENNAN delivered the opinion of the Court, except as to Part III–C.

We must decide in this case whether various incriminating utterances of a drunken-driving suspect, made while performing a series of sobriety tests, constitute testimonial responses to custodial interrogation for purposes of the Self-Incrimination Clause of the Fifth Amendment.

---

*\*Solicitor General Starr, Assistant Attorney General Dennis, Deputy Solicitor General Bryson,* and *Christopher J. Wright* filed a brief for the United States as *amicus curiae* urging reversal.

# I

During the early morning hours of November 30, 1986, a patrol officer spotted respondent Inocencio Muniz and a passenger parked in a car on the shoulder of a highway. When the officer inquired whether Muniz needed assistance, Muniz replied that he had stopped the car so he could urinate. The officer smelled alcohol on Muniz's breath and observed that Muniz's eyes were glazed and bloodshot and his face was flushed. The officer then directed Muniz to remain parked until his condition improved, and Muniz gave assurances that he would do so. But as the officer returned to his vehicle, Muniz drove off. After the officer pursued Muniz down the highway and pulled him over, the officer asked Muniz to perform three standard field sobriety tests: a "horizontal gaze nystagmus" test, a "walk and turn" test, and a "one leg stand" test.[1] Muniz performed these tests poorly, and he informed the officer that he had failed the tests because he had been drinking.

The patrol officer arrested Muniz and transported him to the West Shore facility of the Cumberland County Central Booking Center. Following its routine practice for receiving persons suspected of driving while intoxicated, the booking center videotaped the ensuing proceedings. Muniz was informed that his actions and voice were being recorded, but he

---

[1] The "horizontal gaze nystagmus" test measures the extent to which a person's eyes jerk as they follow an object moving from one side of the person's field of vision to the other. The test is premised on the understanding that, whereas everyone's eyes exhibit some jerking while turning to the side, when the subject is intoxicated "the onset of the jerking occurs after fewer degrees of turning, and the jerking at more extreme angles becomes more distinct." 1 R. Erwin et al., Defense of Drunk Driving Cases § 8A.99, pp. 8A–43, 8A–45 (1989). The "walk and turn" test requires the subject to walk heel to toe along a straight line for nine paces, pivot, and then walk back heel to toe along the line for another nine paces. The subject is required to count each pace aloud from one to nine. The "one leg stand" test requires the subject to stand on one leg with the other leg extended in the air for 30 seconds, while counting aloud from 1 to 30.

was not at this time (nor had he been previously) advised of his rights under *Miranda* v. *Arizona*, 384 U. S. 436 (1966). Officer Hosterman first asked Muniz his name, address, height, weight, eye color, date of birth, and current age. He responded to each of these questions, stumbling over his address and age. The officer then asked Muniz, "Do you know what the date was of your sixth birthday?" After Muniz offered an inaudible reply, the officer repeated, "When you turned six years old, do you remember what the date was?" Muniz responded, "No, I don't."

Officer Hosterman next requested Muniz to perform each of the three sobriety tests that Muniz had been asked to perform earlier during the initial roadside stop. The videotape reveals that his eyes jerked noticeably during the gaze test, that he did not walk a very straight line, and that he could not balance himself on one leg for more than several seconds. During the latter two tests, he did not complete the requested verbal counts from 1 to 9 and from 1 to 30. Moreover, while performing these tests, Muniz "attempted to explain his difficulties in performing the various tasks, and often requested further clarification of the tasks he was to perform." 377 Pa. Super. 382, 390, 547 A. 2d 419, 423 (1988).

Finally, Officer Deyo asked Muniz to submit to a breathalyzer test designed to measure the alcohol content of his expelled breath. Officer Deyo read to Muniz the Commonwealth's Implied Consent Law, 75 Pa. Cons. Stat. § 1547 (1987), and explained that under the law his refusal to take the test would result in automatic suspension of his driver's license for one year. Muniz asked a number of questions about the law, commenting in the process about his state of inebriation. Muniz ultimately refused to take the breath test. At this point, Muniz was for the first time advised of his *Miranda* rights. Muniz then signed a statement waiving his rights and admitted in response to further questioning that he had been driving while intoxicated.

Both the video and audio portions of the videotape were admitted into evidence at Muniz's bench trial,[2] along with the arresting officer's testimony that Muniz failed the roadside sobriety tests and made incriminating remarks at that time. Muniz was convicted of driving under the influence of alcohol in violation of 75 Pa. Cons. Stat. § 3731(a)(1) (1987). Muniz filed a motion for a new trial, contending that the court should have excluded the testimony relating to the field sobriety tests and the videotape taken at the booking center "because they were incriminating and completed prior to [Muniz's] receiving his Miranda warnings." App. to Pet. for Cert. C–5—C–6. The trial court denied the motion, holding that "'requesting a driver, suspected of driving under the influence of alcohol, to perform physical tests or take a breath analysis does not violate [his] privilege against self-incrimination because [the] evidence procured is of a physical nature rather than testimonial, and therefore no Miranda warnings are required.'" *Id.*, at C–6, quoting *Commonwealth* v. *Benson*, 280 Pa. Super. 20, 29, 421 A. 2d 383, 387 (1980).

On appeal, the Superior Court of Pennsylvania reversed. The appellate court agreed that when Muniz was asked "to submit to a field sobriety test, and later perform these tests before the videotape camera, no *Miranda* warnings were required" because such sobriety tests elicit physical, rather than testimonial, evidence within the meaning of the Fifth Amendment. 377 Pa. Super., at 387, 547 A. 2d, at 422. The court concluded, however, that "when the physical nature of the tests begins to yield testimonial and communicative statements . . . the protections afforded by *Miranda* are invoked." *Ibid.* The court explained that Muniz's answer to the question regarding his sixth birthday and the statements and inquiries he made while performing the phys-

---

[2] There was a 14-minute delay between the completion of the physical sobriety tests and the beginning of the breathalyzer test. During this period, Muniz briefly engaged in conversation with Officer Hosterman. This 14-minute segment of the videotape was not shown at trial. App. 29.

ical dexterity tests and discussing the breathalyzer test "are precisely the sort of testimonial evidence that we expressly protected in [previous cases]," *id.*, at 390, 547 A. 2d, at 423, because they "'reveal[ed] his thought processes.'" *Id.*, at 389, 547 A. 2d, at 423. The court further explained: "[N]one of Muniz's utterances were spontaneous, voluntary verbalizations. Rather, they were clearly compelled by the questions and instructions presented to him during his detention at the Booking Center. Since the . . . responses and communications were elicited before Muniz received his *Miranda* warnings, they should have been excluded as evidence." *Id.*, at 390, 547 A. 2d, at 423.[3] Concluding that the audio portion of the videotape should have been suppressed in its entirety, the court reversed Muniz's conviction and remanded the case for a new trial.[4] After the Pennsylvania Supreme Court denied the Commonwealth's application for review, 522 Pa. 575, 559 A. 2d 36 (1989), we granted certiorari. 493 U. S. 916 (1989).

## II

The Self-Incrimination Clause of the Fifth Amendment[5] provides that no "person . . . shall be compelled in any criminal case to be a witness against himself." Although the text does not delineate the ways in which a person might be made

---

[3] The court did not suppress Muniz's verbal admissions to the arresting officer during the roadside tests, ruling that Muniz was not taken into custody for purposes of *Miranda* until he was arrested after the roadside tests were completed. See *Pennsylvania* v. *Bruder*, 488 U. S. 9 (1988).

[4] The Superior Court's opinion refers to Art. 1, § 9, of the Pennsylvania Constitution but explains that this provision "'offers a protection against self-incrimination identical to that provided by the Fifth Amendment.'" 377 Pa. Super., at 386, 547 A. 2d, at 421 (quoting *Commonwealth* v. *Conway*, 368 Pa. Super. 488, 498, 534 A. 2d 541, 546 (1987)). The decision therefore does not rest on an independent and adequate state ground. See *Michigan* v. *Long*, 463 U. S. 1032 (1983).

[5] In *Malloy* v. *Hogan*, 378 U. S. 1 (1964), we held the privilege against self-incrimination applicable to the States through the Fourteenth Amendment.

a "witness against himself," cf. *Schmerber* v. *California*, 384 U. S. 757, 761–762, n. 6 (1966), we have long held that the privilege does not protect a suspect from being compelled by the State to produce "real or physical evidence." *Id.*, at 764. Rather, the privilege "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature." *Id.*, at 761. "[I]n order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. Only then is a person compelled to be a 'witness' against himself." *Doe* v. *United States*, 487 U. S. 201, 210 (1988).

In *Miranda* v. *Arizona*, 384 U. S. 436 (1966), we reaffirmed our previous understanding that the privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but also from "informal compulsion exerted by law-enforcement officers during in-custody questioning." *Id.*, at 461. Of course, voluntary statements offered to police officers "remain a proper element in law enforcement." *Id.*, at 478. But "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.*, at 467. Accordingly, we held that protection of the privilege against self-incrimination during pretrial questioning requires application of special "procedural safeguards." *Id.*, at 444. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Ibid.* Unless a suspect "voluntarily, knowingly and intelligently" waives these rights, *ibid.*, any incriminating responses to questioning may not be introduced into evidence in the prosecution's case in chief in a subsequent criminal proceeding.

This case implicates both the "testimonial" and "compulsion" components of the privilege against self-incrimination in the context of pretrial questioning. Because Muniz was not advised of his *Miranda* rights until after the videotaped proceedings at the booking center were completed, any verbal statements that were both testimonial in nature and elicited during custodial interrogation should have been suppressed. We focus first on Muniz's responses to the initial informational questions, then on his questions and utterances while performing the physical dexterity and balancing tests, and finally on his questions and utterances surrounding the breathalyzer test.

### III

In the initial phase of the recorded proceedings, Officer Hosterman asked Muniz his name, address, height, weight, eye color, date of birth, current age, and the date of his sixth birthday. Both the delivery and content of Muniz's answers were incriminating. As the state court found, "Muniz's videotaped responses . . . certainly led the finder of fact to infer that his confusion and failure to speak clearly indicated a state of drunkenness that prohibited him from safely operating his vehicle." 377 Pa. Super., at 390, 547 A. 2d, at 423. The Commonwealth argues, however, that admission of Muniz's answers to these questions does not contravene Fifth Amendment principles because Muniz's statement regarding his sixth birthday was not "testimonial" and his answers to the prior questions were not elicited by custodial interrogation. We consider these arguments in turn.

### A

We agree with the Commonwealth's contention that Muniz's answers are not rendered inadmissible by *Miranda* merely because the slurred nature of his speech was incriminating. The physical inability to articulate words in a clear manner due to "the lack of muscular coordination of his tongue and mouth," Brief for Petitioner 16, is not itself a tes-

timonial component of Muniz's responses to Officer Hosterman's introductory questions. In *Schmerber* v. *California, supra,* we drew a distinction between "testimonial" and "real or physical evidence" for purposes of the privilege against self-incrimination. We noted that in *Holt* v. *United States,* 218 U. S. 245, 252–253 (1910), Justice Holmes had written for the Court that " '[t]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material.' " 384 U. S., at 763. We also acknowledged that "both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." *Id.,* at 764. Embracing this view of the privilege's contours, we held that "the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." *Ibid.* Using this "helpful framework for analysis," *ibid.,* we held that a person suspected of driving while intoxicated could be forced to provide a blood sample, because that sample was "real or physical evidence" outside the scope of the privilege and the sample was obtained in a manner by which "[p]etitioner's testimonial capacities were in no way implicated." *Id.,* at 765.

We have since applied the distinction between "real or physical" and "testimonial" evidence in other contexts where the evidence could be produced only through some volitional act on the part of the suspect. In *United States* v. *Wade,* 388 U. S. 218 (1967), we held that a suspect could be compelled to participate in a lineup and to repeat a phrase provided by the police so that witnesses could view him and listen to his voice. We explained that requiring his presence and speech at a lineup reflected "compulsion of the accused to

exhibit his physical characteristics, not compulsion to disclose any knowledge he might have." *Id.*, at 222; see *id.*, at 222–223 (suspect was "required to use his voice as an identifying physical characteristic"). In *Gilbert* v. *California*, 388 U. S. 263 (1967), we held that a suspect could be compelled to provide a handwriting exemplar, explaining that such an exemplar, "in contrast to the content of what is written, like the voice or body itself, is an identifying physical characteristic outside [the privilege's] protection." *Id.*, at 266–267. And in *United States* v. *Dionisio*, 410 U. S. 1 (1973), we held that suspects could be compelled to read a transcript in order to provide a voice exemplar, explaining that the "voice recordings were to be used solely to measure the physical properties of the witnesses' voices, not for the testimonial or communicative content of what was to be said." *Id.*, at 7.

Under *Schmerber* and its progeny, we agree with the Commonwealth that any slurring of speech and other evidence of lack of muscular coordination revealed by Muniz's responses to Officer Hosterman's direct questions constitute nontestimonial components of those responses. Requiring a suspect to reveal the physical manner in which he articulates words, like requiring him to reveal the physical properties of the sound produced by his voice, see *Dionisio, supra*, does not, without more, compel him to provide a "testimonial" response for purposes of the privilege.

## B

This does not end our inquiry, for Muniz's answer to the sixth birthday question was incriminating, not just because of his delivery, but also because of his answer's *content;* the trier of fact could infer from Muniz's answer (that he did not *know* the proper date) that his mental state was confused.[6]

---

[6] Under Pennsylvania law, driving under the influence of alcohol consists of driving while intoxicated to a degree " 'which substantially impairs [the suspect's] judgment, or clearness of intellect, or any of the normal faculties essential to the safe operation of an automobile.' " *Commonwealth*

The Commonwealth and the United States as *amicus curiae* argue that this incriminating inference does not trigger the protections of the Fifth Amendment privilege because the inference concerns "the physiological functioning of [Muniz's] brain," Brief for Petitioner 21, which is asserted to be every bit as "real or physical" as the physiological makeup of his blood and the timbre of his voice.

But this characterization addresses the wrong question; that the "fact" to be inferred might be said to concern the physical status of Muniz's brain merely describes the way in which the inference is incriminating. The correct question for present purposes is whether the incriminating inference of mental confusion is drawn from a testimonial act or from physical evidence. In *Schmerber*, for example, we held that the police could compel a suspect to provide a blood sample in order to determine the physical makeup of his blood and thereby draw an inference about whether he was intoxicated. This compulsion was outside of the Fifth Amendment's protection, not simply because the evidence concerned the suspect's physical body, but rather because the evidence was *obtained* in a manner that did not entail any testimonial act on the part of the suspect: "Not even a shadow of testimonial compulsion upon or enforced communication by the accused was involved either in the extraction or in the chemical analysis." 384 U. S., at 765. In contrast, had the police instead asked the suspect directly whether his blood contained a high concentration of alcohol, his affirmative response would have been testimonial even though it would have been used to draw the same inference concerning his physiology. See *ibid.* ("[T]he blood test evidence . . . was neither [the suspect's] testimony nor evidence relating to some communicative act"). In this case, the question is not whether a suspect's "impaired mental faculties" can fairly be characterized as an aspect of his physiology, but rather whether Muniz's re-

v. *Griscavage*, 512 Pa. 540, 545, 517 A. 2d 1256, 1258 (1986) (emphasis deleted).

sponse to the sixth birthday question that gave rise to the inference of such an impairment was testimonial in nature.[7]

We recently explained in *Doe* v. *United States*, 487 U. S. 201 (1988), that "in order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Id.*, at 210. We reached this conclusion after addressing our reasoning in *Schmerber*, *supra*, and its progeny:

> "The Court accordingly held that the privilege was not implicated in [the line of cases beginning with *Schmerber*], because the suspect was not required 'to disclose any knowledge he might have,' or 'to speak his guilt.' *Wade*, 388 U. S., at 222–223. See *Dionisio*, 410 U. S., at 7; *Gilbert*, 388 U. S., at 266–267. It is the 'extortion of information from the accused,' *Couch* v. *United States*, 409 U. S., at 328, the attempt to force him 'to disclose the contents of his own mind,' *Curcio* v. *United States*, 354 U. S. 118, 128 (1957), that implicates the Self-Incrimination Clause. . . . 'Unless some attempt is made to secure a communication—written, oral or otherwise—upon which reliance is to be placed as involving [the accused's] consciousness of the facts and the operations of his mind in expressing it, the demand made upon

[7] See, *e. g.*, *Doe* v. *United States*, 487 U. S. 201, 211, n. 10 (1988) ("[T]he *Schmerber* line of cases does not draw a distinction between unprotected evidence sought for its physical characteristics and protected evidence sought for its [other] content. Rather, the Court distinguished between the suspect's being compelled himself to *serve as evidence* and the suspect's being compelled to *disclose or communicate information or facts* that might serve as or lead to incriminating evidence") (emphasis added); cf. *Baltimore Dept. of Social Services* v. *Bouknight*, 493 U. S. 549, 555 (1990) (individual compelled to produce document or other tangible item to State "may not claim the [Fifth] Amendment's protections based upon the incrimination that may result from the contents or nature of the thing demanded" but may "clai[m] the benefits of the privilege because the act of production would amount to testimony").

him is not a testimonial one.'   8 Wigmore § 2265, p. 386."
487 U. S., at 210–211.

After canvassing the purposes of the privilege recognized in prior cases,[8] we concluded that "[t]hese policies are served when the privilege is asserted to spare the accused from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government."[9]   *Id.*, at 213.

This definition of testimonial evidence reflects an awareness of the historical abuses against which the privilege against self-incrimination was aimed.   "Historically, the privilege was intended to prevent the use of legal compulsion to extract from the accused a sworn communication of facts which would incriminate him.   Such was the process of the

---

[8] See *Doe, supra,* at 212–213 (quoting *Murphy* v. *Waterfront Comm'n of New York Harbor,* 378 U. S. 52, 55 (1964) (internal citations omitted)): "[T]he privilege is founded on 'our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government . . . in its contest with the individual to shoulder the entire load," . . . ; our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life," . . . ; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent." ' "

[9] This definition applies to both verbal and nonverbal conduct; nonverbal conduct contains a testimonial component whenever the conduct reflects the actor's communication of his thoughts to another.   See *Doe, supra,* at 209–210, and n. 8; *Schmerber* v. *California,* 384 U. S. 757, 761, n. 5 (1966) ("A nod or head-shake is as much a 'testimonial' or 'communicative' act in this sense as are spoken words"); see also *Braswell* v. *United States,* 487 U. S. 99, 122 (1988) (KENNEDY, J., dissenting) ("Those assertions [contained within the act of producing subpoenaed documents] can convey information about that individual's knowledge and state of mind as effectively as spoken statements, and the Fifth Amendment protects individuals from having such assertions compelled by their own acts").

ecclesiastical courts and the Star Chamber—the inquisitorial method of putting the accused upon his oath and compelling him to answer questions designed to uncover uncharged offenses, without evidence from another source. The major thrust of the policies undergirding the privilege is to prevent such compulsion." *Id.*, at 212 (citations omitted); see also *Andresen* v. *Maryland*, 427 U. S. 463, 470–471 (1976). At its core, the privilege reflects our fierce "'unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt,'" *Doe*, 487 U. S., at 212 (citation omitted), that defined the operation of the Star Chamber, wherein suspects were forced to choose between revealing incriminating private thoughts and forsaking their oath by committing perjury. See *United States* v. *Nobles*, 422 U. S. 225, 233 (1975) ("The Fifth Amendment privilege against compulsory self-incrimination . . . protects 'a private inner sanctum of individual feeling and thought and proscribes state intrusion to extract self-condemnation'") (quoting *Couch* v. *United States*, 409 U. S. 322, 327 (1973)).

We need not explore the outer boundaries of what is "testimonial" today, for our decision flows from the concept's core meaning. Because the privilege was designed primarily to prevent "a recurrence of the Inquisition and the Star Chamber, even if not in their stark brutality," *Ullmann* v. *United States*, 350 U. S. 422, 428 (1956), it is evident that a suspect is "compelled . . . to be a witness against himself" at least whenever he must face the modern-day analog of the historic trilemma—either during a criminal trial where a sworn witness faces the identical three choices, or during custodial interrogation where, as we explained in *Miranda*, the choices are analogous and hence raise similar concerns.[10] Whatever

---

[10] During custodial interrogation, the pressure on the suspect to respond flows not from the threat of contempt sanctions, but rather from the "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda* v. *Arizona*, 384 U. S. 436, 467 (1966). Moreover,

else it may include, therefore, the definition of "testimonial" evidence articulated in *Doe* must encompass all responses to questions that, if asked of a sworn suspect during a criminal trial, could place the suspect in the "cruel trilemma." This conclusion is consistent with our recognition in *Doe* that "[t]he vast majority of verbal statements thus will be testimonial" because "[t]here are very few instances in which a verbal statement, either oral or written, will not convey information or assert facts." 487 U. S., at 213. Whenever a suspect is asked for a response requiring him to communicate an express or implied assertion of fact or belief,[11] the suspect confronts the "trilemma" of truth, falsity, or silence, and hence the response (whether based on truth or falsity) contains a testimonial component.

This approach accords with each of our post-*Schmerber* cases finding that a particular oral or written response to express or implied questioning was nontestimonial; the questions presented in these cases did not confront the suspects with this trilemma. As we noted in *Doe, supra*, at 210–211, the cases upholding compelled writing and voice exemplars did not involve situations in which suspects were asked to communicate any personal beliefs or knowledge of facts, and therefore the suspects were not forced to choose between

false testimony does not give rise directly to sanctions (either religious sanctions for lying under oath or prosecutions for perjury), but only indirectly (false testimony might itself prove incriminating, either because it links (albeit falsely) the suspect to the crime or because the prosecution might later prove at trial that the suspect lied to the police, giving rise to an inference of guilty conscience). Despite these differences, however, "[w]e are satisfied that all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning." *Id.*, at 461; see *id.*, at 458 (noting "intimate connection between the privilege against self-incrimination and police custodial questioning").

[11] As we explain *infra*, at 600–601, for purposes of custodial interrogation such a question may be either express, as in this case, or else implied through words or actions reasonably likely to elicit a response.

truthfully or falsely revealing their thoughts. We carefully noted in *Gilbert* v. *California*, 388 U. S. 263 (1967), for example, that a "mere handwriting exemplar, *in contrast to the content of what is written*, like the voice or body itself, is an identifying physical characteristic outside [the privilege's] protection." *Id.*, at 266–267 (emphasis added). Had the suspect been asked to provide a writing sample of his own composition, the content of the writing would have reflected his assertion of facts or beliefs and hence would have been testimonial; but in *Gilbert* "[n]o claim [was] made that the content of the exemplars was testimonial or communicative matter." *Id.*, at 267.[12] And in *Doe*, the suspect was asked merely to sign a consent form waiving a privacy interest in foreign bank records. Because the consent form spoke in the hypothetical and did not identify any particular banks, accounts, or private records, the form neither "communicate[d] any factual assertions, implicit or explicit, [n]or convey[ed] any information to the Government." 487 U. S., at 215. We concluded, therefore, that compelled execution of the consent directive did not "forc[e] [the suspect] to express the contents of his mind," *id.*, at 210, n. 9, but rather forced the suspect only to make a "nonfactual statement." *Id.*, at 213, n. 11.

In contrast, the sixth birthday question in this case required a testimonial response. When Officer Hosterman

[12] See also *United States* v. *Wade*, 388 U. S. 218, 222–223 (1967) ("[T]o utter words purportedly uttered by the robber [and dictated to the suspect by the police] was not compulsion to utter statements of a 'testimonial' nature; [the suspect] was required to use his voice as an identifying physical characteristic, not to speak his guilt" because the words did not reflect any facts or beliefs asserted by the suspect); *United States* v. *Dionisio*, 410 U. S. 1, 7 (1973) (where suspects were asked to create voice exemplars by reading already-prepared transcripts, the "voice recordings were to be used solely to measure the physical properties of the witnesses' voices, not for the testimonial or communicative content of what was to be said" because the content did not reflect any facts or beliefs asserted by the suspects).

asked Muniz if he knew the date of his sixth birthday and Muniz, for whatever reason, could not remember or calculate that date, he was confronted with the trilemma. By hypothesis, the inherently coercive environment created by the custodial interrogation precluded the option of remaining silent, see n. 10, *supra*. Muniz was left with the choice of incriminating himself by admitting that he did not then know the date of his sixth birthday, or answering untruthfully by reporting a date that he did not then believe to be accurate (an incorrect guess would be incriminating as well as untruthful). The content of his truthful answer supported an inference that his mental faculties were impaired, because his assertion (he did not know the date of his sixth birthday) was different from the assertion (he knew the date was (correct date)) that the trier of fact might reasonably have expected a lucid person to provide. Hence, the incriminating inference of impaired mental faculties stemmed, not just from the fact that Muniz slurred his response, but also from a testimonial aspect of that response.[13]

---

[13] The Commonwealth's protest that it had no investigatory interest in the actual date of Muniz's sixth birthday, see Tr. of Oral Arg. 18, is inapposite. The critical point is that the Commonwealth had an investigatory interest in Muniz's assertion of belief that was communicated by his answer to the question. Putting it another way, the Commonwealth may not have cared about the *correct* answer, but it cared about *Muniz's* answer. The incriminating inference stems from the then-existing contents of Muniz's mind as evidenced by his assertion of his knowledge at that time.

This distinction is reflected in *Estelle* v. *Smith*, 451 U. S. 454 (1981), where we held that a defendant's answers to questions during a psychiatric examination were testimonial in nature. The psychiatrist asked a series of questions, some focusing on the defendant's account of the crime. After analyzing both the "statements [the defendant] made, and remarks he omitted," *id.*, at 464, the psychiatrist made a prognosis as to the defendant's "future dangerousness" and testified to this effect at his capital sentencing hearing. The psychiatrist had no investigative interest in whether the defendant's account of the crime and other disclosures were either accurate or complete as a historical matter; rather, he relied on the remarks—both those made and omitted—to infer that the defendant would

The state court held that the sixth birthday question constituted an unwarned interrogation for purposes of the privilege against self-incrimination, 377 Pa. Super., at 390, 547 A. 2d, at 423, and that Muniz's answer was incriminating. *Ibid.* The Commonwealth does not question either conclusion. Therefore, because we conclude that Muniz's response to the sixth birthday question was testimonial, the response should have been suppressed.

C

The Commonwealth argues that the seven questions asked by Officer Hosterman just *prior* to the sixth birthday question—regarding Muniz's name, address, height, weight, eye color, date of birth, and current age—did not constitute custodial interrogation as we have defined the term in *Miranda* and subsequent cases. In *Miranda*, the Court referred to "interrogation" as actual "questioning initiated by law enforcement officers." 384 U. S., at 444. We have since clarified that definition, finding that the "goals of the *Miranda* safeguards could be effectuated if those safeguards extended not only to express questioning, but also to 'its functional equivalent.'" *Arizona* v. *Mauro*, 481 U. S. 520, 526 (1987). In *Rhode Island* v. *Innis*, 446 U. S. 291 (1980), the Court defined the phrase "functional equivalent" of express questioning to include "any words or actions on the part of the police (other than those normally attendant to arrest and custody)

---

likely pose a threat to society in the future because of his state of mind. We nevertheless explained that the "Fifth Amendment privilege . . . is directly involved here because the State used as evidence against [the defendant] the *substance of his disclosures* during the pretrial psychiatric examination." *Id.*, at 464–465 (emphasis added). The psychiatrist may have presumed the defendant's remarks to be truthful for purposes of drawing his inferences as to the defendant's state of mind, see *South Dakota* v. *Neville*, 459 U. S. 553, 561–562, n. 12 (1983), but that is true in Muniz's case as well: The incriminating inference of mental confusion is based on the premise that Muniz was responding truthfully to Officer Hosterman's question when he stated that he did not then know the date of his sixth birthday.

that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.*, at 301 (footnotes omitted); see also *Illinois* v. *Perkins, ante,* at 296. However, "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining" what the police reasonably should have known. *Innis, supra,* at 302, n. 8. Thus, custodial interrogation for purposes of *Miranda* includes both express questioning and words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to "have . . . the force of a question on the accused," *Harryman* v. *Estelle,* 616 F. 2d 870, 874 (CA5 1980), and therefore be reasonably likely to elicit an incriminating response.

We disagree with the Commonwealth's contention that Officer Hosterman's first seven questions regarding Muniz's name, address, height, weight, eye color, date of birth, and current age do not qualify as custodial interrogation as we defined the term in *Innis, supra,* merely because the questions were not intended to elicit information for investigatory purposes. As explained above, the *Innis* test focuses primarily upon "the perspective of the suspect." *Perkins, ante,* at 296. We agree with *amicus* United States, however, that Muniz's answers to these first seven questions are nonetheless admissible because the questions fall within a "routine booking question" exception which exempts from *Miranda*'s coverage questions to secure the "'biographical data necessary to complete booking or pretrial services.'" Brief for United States as *Amicus Curiae* 12, quoting *United States* v. *Horton,* 873 F. 2d 180, 181, n. 2 (CA8 1989). The state court found that the first seven questions were "requested for record-keeping purposes only," App. B16, and therefore the questions appear reasonably related to the police's adminis-

trative concerns.[14]  In this context, therefore, the first seven questions asked at the booking center fall outside the protections of *Miranda* and the answers thereto need not be suppressed.

## IV

During the second phase of the videotaped proceedings, Officer Hosterman asked Muniz to perform the same three sobriety tests that he had earlier performed at roadside prior to his arrest: the "horizontal gaze nystagmus" test, the "walk and turn" test, and the "one leg stand" test.  While Muniz was attempting to comprehend Officer Hosterman's instructions and then perform the requested sobriety tests, Muniz made several audible and incriminating statements.[15]  Muniz argued to the state court that both the videotaped performance of the physical tests themselves and the audiorecorded verbal statements were introduced in violation of *Miranda*.

The court refused to suppress the videotaped evidence of Muniz's paltry performance on the physical sobriety tests, reasoning that " '[r]equiring a driver to perform physical [sobriety] tests . . . does not violate the privilege against self-incrimination because the evidence procured is of a physical nature rather than testimonial.' "  377 Pa. Super., at 387, 547 A. 2d, at 422 (quoting *Commonwealth* v. *Benson*, 280 Pa.

---

[14] As *amicus* United States explains, "[r]ecognizing a 'booking exception' to *Miranda* does not mean, of course, that any question asked during the booking process falls within that exception.  Without obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions."  Brief for United States as *Amicus Curiae* 13.  See, *e. g.*, *United States* v. *Avery*, 717 F. 2d 1020, 1024–1025 (CA6 1983); *United States* v. *Mata-Abundiz*, 717 F. 2d 1277, 1280 (CA9 1983); *United States* v. *Glen-Archila*, 677 F. 2d 809, 816, n. 18 (CA11 1982).

[15] Most of Muniz's utterances were not clearly discernible, though several of them suggested excuses as to why he could not perform the physical tests under these circumstances.

Super., at 29, 421 A. 2d, at 387).[16]   With respect to Muniz's verbal statements, however, the court concluded that "none of Muniz's utterances were spontaneous, voluntary verbalizations," 377 Pa. Super., at 390, 547 A. 2d, at 423, and because they were "elicited before Muniz received his *Miranda* warnings, they should have been excluded as evidence." *Ibid.*

We disagree.  Officer Hosterman's dialogue with Muniz concerning the physical sobriety tests consisted primarily of carefully scripted instructions as to how the tests were to be performed.  These instructions were not likely to be perceived as calling for any verbal response and therefore were not "words or actions" constituting custodial interrogation, with two narrow exceptions not relevant here.[17]   The dialogue also contained limited and carefully worded inquiries as to whether Muniz understood those instructions, but these focused inquiries were necessarily "attendant to" the police

---

[16] This conclusion is in accord with that of many other state courts, which have reasoned that standard sobriety tests measuring reflexes, dexterity, and balance do not require the performance of testimonial acts.  See, *e. g.*, *Weatherford* v. *State*, 286 Ark. 376, 692 S. W. 2d 605 (1985); *People* v. *Boudreau*, 115 App. Div. 2d 652, 496 N. Y. S. 2d 489 (1985); *Commonwealth* v. *Brennan*, 386 Mass. 772, 438 N. E. 2d 60 (1982); *State* v. *Badon*, 401 So. 2d 1178 (La. 1981); *State* v. *Arsenault*, 115 N. H. 109, 336 A. 2d 244 (1975).  Muniz does not challenge the state court's conclusion on this point, and therefore we have no occasion to review it.

[17] The two exceptions consist of Officer Hosterman's requests that Muniz count aloud from 1 to 9 while performing the "walk and turn" test and that he count aloud from 1 to 30 while balancing during the "one leg stand" test. Muniz's counting at the officer's request qualifies as a response to custodial interrogation.  However, as Muniz counted accurately (in Spanish) for the duration of his performance on the "one leg stand" test (though he did not complete it), his verbal response to this instruction was not incriminating *except to the extent that it exhibited a tendency to slur words, which we* have already explained is a nontestimonial component of his response. See *supra*, at 590–592.  Muniz did not count during the "walk and turn" test, and he does not argue that his failure to do so has any independent incriminating significance.  We therefore need not decide today whether Muniz's counting (or not counting) itself was "testimonial" within the meaning of the privilege.

procedure held by the court to be legitimate. Hence, Muniz's incriminating utterances during this phase of the videotaped proceedings were "voluntary" in the sense that they were not elicited in response to custodial interrogation.[18] See *South Dakota* v. *Neville*, 459 U. S. 553, 564, n. 15 (1983) (drawing analogy to "police request to submit to fingerprinting or photography" and holding that police inquiry whether suspect would submit to blood-alcohol test was not "interrogation within the meaning of *Miranda*").

Similarly, we conclude that *Miranda* does not require suppression of the statements Muniz made when asked to submit to a breathalyzer examination. Officer Deyo read Muniz a prepared script explaining how the test worked, the nature of Pennsylvania's Implied Consent Law, and the legal consequences that would ensue should he refuse. Officer Deyo then asked Muniz whether he understood the nature of the test and the law and whether he would like to submit to the test. Muniz asked Officer Deyo several questions concerning the legal consequences of refusal, which Deyo answered directly, and Muniz then commented upon his state of inebriation. 377 Pa. Super., at 387, 547 A. 2d, at 422. After offering to take the test only after waiting a couple of hours or drinking some water, Muniz ultimately refused.[19]

---

[18] We cannot credit the state court's contrary determination that Muniz's utterances (both during this phase of the proceedings and during the next when he was asked to provide a breath sample) were compelled rather than voluntary. 377 Pa. Super., at 390, 547 A. 2d, at 423. The court did not explain how it reached this conclusion, nor did it cite *Innis* or any other case defining custodial interrogation.

[19] Muniz does not and cannot challenge the introduction into evidence of his refusal to submit to the breathalyzer test. In *South Dakota* v. *Neville*, 459 U. S. 553 (1983), we held that since submission to a blood test could itself be compelled, see *Schmerber* v. *California*, 384 U. S. 757 (1966), a State's decision to permit a suspect to refuse to take the test but then to comment upon that refusal at trial did not "compel" the suspect to incriminate himself and hence did not violate the privilege. *Neville, supra*, at 562–564. We see no reason to distinguish between chemical blood tests

We believe that Muniz's statements were not prompted by an interrogation within the meaning of *Miranda*, and therefore the absence of *Miranda* warnings does not require suppression of these statements at trial.[20]   As did Officer Hosterman when administering the three physical sobriety tests, see *supra*, at 603–604, Officer Deyo carefully limited her role to providing Muniz with relevant information about the breathalyzer test and the Implied Consent Law.   She questioned Muniz only as to whether he understood her instructions and wished to submit to the test.   These limited and focused inquiries were necessarily "attendant to" the legitimate police procedure, see *Neville, supra*, at 564, n. 15, and were not likely to be perceived as calling for any incriminating response.[21]

## V

We agree with the state court's conclusion that *Miranda* requires suppression of Muniz's response to the question regarding the date of his sixth birthday, but we do not agree that the entire audio portion of the videotape must be suppressed.[22]   Accordingly, the court's judgment reversing

and breathalyzer tests for these purposes.   Cf. *Schmerber, supra*, at 765–766, n. 9.

[20] We noted in *Schmerber* that "there may be circumstances in which the pain, danger, or severity of an operation [or other test seeking physical evidence] would almost inevitably cause a person to prefer confession to undergoing the 'search,'" 384 U. S., at 765, n. 9, and in such cases "[i]f it wishes to compel persons to submit to such attempts to discover evidence, the State may have to forgo the advantage of any *testimonial* products of administering the test."   *Ibid.*   See also *Neville, supra*, at 563 ("Fifth Amendment may bar the use of testimony obtained when the proffered alternative was to submit to a test so painful, dangerous, or severe, or so violative of religious beliefs, that almost inevitably a person would prefer 'confession'").   But Muniz claims no such extraordinary circumstance here.

[21] See n. 18, *supra*.

[22] The parties have not asked us to decide whether any error in this case was harmless.   The state court is free, of course, to consider this question upon remand.

Muniz's conviction is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, with whom JUSTICE WHITE, JUSTICE BLACKMUN, and JUSTICE STEVENS join, concurring in part, concurring in the result in part, and dissenting in part.

I join Parts I, II, III–A, and IV of the Court's opinion. In addition, although I agree with the conclusion in Part III–C that the seven "booking" questions should not be suppressed, I do so for a reason different from that of JUSTICE BRENNAN. I dissent from the Court's conclusion that Muniz's response to the "sixth birthday question" should have been suppressed.

The Court holds that the sixth birthday question Muniz was asked required a testimonial response, and that its admission at trial therefore violated Muniz's privilege against compulsory self-incrimination. The Court says:

> "When Officer Hosterman asked Muniz if he knew the date of his sixth birthday and Muniz, for whatever reason, could not remember or calculate that date, he was confronted with the trilemma [*i. e.*, the '"trilemma" of truth, falsity, or silence,' see *ante*, at 597]. . . . Muniz was left with the choice of incriminating himself by admitting that he did not then know the date of his sixth birthday, or answering untruthfully by reporting a date that he did not then believe to be accurate (an incorrect guess would be incriminating as well as untruthful)." *Ante*, at 598-599.

As an assumption about human behavior, this statement is wrong. Muniz would no more have felt compelled to fabricate a false date than one who cannot read the letters on an eye chart feels compelled to fabricate false letters; nor does a wrong guess call into question a speaker's veracity. The Court's statement is also a flawed predicate on which to base its conclusion that Muniz's answer to this question was "testimonial" for purposes of the Fifth Amendment.

The need for the use of the human voice does not automatically make an answer testimonial, *United States* v. *Wade*, 388 U. S. 218, 222–223 (1967), any more than does the fact that a question calls for the exhibition of one's handwriting in written characters. *Gilbert* v. *California*, 388 U. S. 263, 266–267 (1967). In *Schmerber* v. *California*, 384 U. S. 757 (1966), we held that the extraction and chemical analysis of a blood sample involved no "shadow of testimonial compulsion upon or enforced communication by the accused." *Id.*, at 765. All of these holdings were based on Justice Holmes' opinion in *Holt* v. *United States*, 218 U. S. 245 (1910), where he said for the Court that "the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material." *Id.*, at 252–253.

The sixth birthday question here was an effort on the part of the police to check how well Muniz was able to do a simple mathematical exercise. Indeed, had the question related only to the date of his birth, it presumably would have come under the "booking exception" to *Miranda* v. *Arizona*, 384 U. S. 436 (1966), to which the Court refers elsewhere in its opinion. The Court holds in this very case that Muniz may be required to perform a "horizontal gaze nystagmus" test, the "walk and turn" test, and the "one leg stand" test, all of which are designed to test a suspect's physical coordination. If the police may require Muniz to use his body in order to demonstrate the level of his physical coordination, there is no reason why they should not be able to require him to speak or write in order to determine his mental coordination. That was all that was sought here. Since it was permissible for the police to extract and examine a sample of Schmerber's blood to determine how much that part of his system had been affected by alcohol, I see no reason why they may not examine the functioning of Muniz's mental processes for the same purpose.

Surely if it were relevant, a suspect might be asked to take an eye examination in the course of which he might have to admit that he could not read the letters on the third line of the chart. At worst, he might utter a mistaken guess. Muniz likewise might have attempted to guess the correct response to the sixth birthday question instead of attempting to calculate the date or answer "I don't know." But the potential for giving a bad guess does not subject the suspect to the truth-falsity-silence predicament that renders a response testimonial and, therefore, within the scope of the Fifth Amendment privilege.

For substantially the same reasons, Muniz's responses to the videotaped "booking" questions were not testimonial and do not warrant application of the privilege. Thus, it is unnecessary to determine whether the questions fall within the "routine booking question" exception to *Miranda* JUSTICE BRENNAN recognizes.

I would reverse in its entirety the judgment of the Superior Court of Pennsylvania. But given the fact that five members of the Court agree that Muniz's response to the sixth birthday question should have been suppressed, I agree that the judgment of the Superior Court should be vacated so that, on remand, the court may consider whether admission of the response at trial was harmless error.

JUSTICE MARSHALL, concurring in part and dissenting in part.

I concur in Part III–B of the Court's opinion that the "sixth birthday question" required a testimonial response from respondent Muniz. For the reasons discussed below, see n. 1, *infra*, that question constituted custodial interrogation. Because the police did not apprise Muniz of his rights under *Miranda* v. *Arizona*, 384 U. S. 436 (1966), before asking the question, his response should have been suppressed.

I disagree, however, with JUSTICE BRENNAN's recognition in Part III–C of a "routine booking question" exception to *Miranda*. Moreover, even were such an exception war-

ranted, it should not extend to booking questions that the police should know are reasonably likely to elicit incriminating responses. Because the police in this case should have known that the seven booking questions were reasonably likely to elicit incriminating responses and because those questions were not preceded by *Miranda* warnings, Muniz's testimonial responses should have been suppressed.

I dissent from the Court's holding in Part IV that Muniz's testimonial statements in connection with the three sobriety tests and the breathalyzer test were not the products of custodial interrogation. The police should have known that the circumstances in which they confronted Muniz, combined with the detailed instructions and questions concerning the tests and the Commonwealth's Implied Consent Law, were reasonably likely to elicit an incriminating response, and therefore constituted the "functional equivalent" of express questioning. *Rhode Island* v. *Innis*, 446 U. S. 291, 301 (1980). Muniz's statements to the police in connection with these tests thus should have been suppressed because he was not first given the *Miranda* warnings.

Finally, the officer's directions to Muniz to count aloud during two of the sobriety tests sought testimonial responses, and Muniz's responses were incriminating. Because Muniz was not informed of his *Miranda* rights prior to the tests, those responses also should have been suppressed.

I

A

JUSTICE BRENNAN would create yet another exception to *Miranda:* the "routine booking question" exception. See also *Illinois* v. *Perkins, ante,* p. 292 (creating exception to *Miranda* for custodial interrogation by an undercover police officer posing as the suspect's fellow prison inmate). Such exceptions undermine *Miranda*'s fundamental principle that the doctrine should be clear so that it can be easily applied by both police and courts. See *Miranda, supra,* at 441–442;

*Fare* v. *Michael C.*, 442 U. S. 707, 718 (1979); *Perkins, ante,* at 308–309 (MARSHALL, J., dissenting). JUSTICE BRENNAN's position, were it adopted by a majority of the Court, would necessitate difficult, time-consuming litigation over whether particular questions asked during booking are "routine," whether they are necessary to secure biographical information, whether that information is itself necessary for recordkeeping purposes, and whether the questions are—despite their routine nature—designed to elicit incriminating testimony. The far better course would be to maintain the clarity of the doctrine by requiring police to preface all direct questioning of a suspect with *Miranda* warnings if they want his responses to be admissible at trial.

B

JUSTICE BRENNAN nonetheless asserts that *Miranda* does not apply to express questioning designed to secure " ' "biographical data necessary to complete booking or pretrial services," ' " *ante,* at 601 (citation omitted), so long as the questioning is not " 'designed to elicit incriminatory admissions,' " *ante,* at 602, n. 14 (quoting Brief for United States as *Amicus Curiae* 13; citing *United States* v. *Avery,* 717 F. 2d 1020, 1024–1025 (CA6 1983) (acknowledging that "[e]ven a relatively innocuous series of questions may, in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response"); *United States* v. *Mata-Abundiz,* 717 F. 2d 1277, 1280 (CA9 1983) (holding that routine booking question exception does not apply if "the questions are reasonably likely to elicit an incriminating response in a particular situation"); *United States* v. *Glen-Archila,* 677 F. 2d 809, 816, n. 18 (CA11 1982) ("Even questions that usually are routine must be proceeded *[sic]* by *Miranda* warnings if they are intended to produce answers that are incriminating")). Even if a routine booking question exception to *Miranda* were warranted, that exception should not extend to any booking question

that the police should know is reasonably likely to elicit an incriminating response, cf. *Innis*, 446 U. S., at 301, regardless of whether the question is "designed" to elicit an incriminating response. Although the police's intent to obtain an incriminating response is relevant to this inquiry, the key components of the analysis are the nature of the questioning, the attendant circumstances, and the perceptions of the suspect. Cf. *id.*, at 301, n. 7. Accordingly, *Miranda* warnings are required before the police may engage in any questioning reasonably likely to elicit an incriminating response.

Here, the police should have known that the seven booking questions—regarding Muniz's name, address, height, weight, eye color, date of birth, and age—were reasonably likely to elicit incriminating responses from a suspect whom the police believed to be intoxicated. Cf. *id.*, at 302, n. 8 ("Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect"). Indeed, as the Court acknowledges, Muniz did in fact "stumbl[e] over his address and age," *ante*, at 586; more specifically, he was unable to give his address without looking at his license and initially told police the wrong age. Moreover, the very fact that, after a suspect has been arrested for driving under the influence, the Pennsylvania police regularly videotape the subsequent questioning strongly implies a purpose to the interrogation other than "recordkeeping." The seven questions in this case, then, do not fall within the routine booking question exception even under JUSTICE BRENNAN's standard.[1]

---

[1] The sixth birthday question also clearly constituted custodial interrogation because it was a form of "express questioning." *Rhode Island* v. *Innis*, 446 U. S. 291, 300–301 (1980). Furthermore, that question would not fall within JUSTICE BRENNAN's proposed routine booking question exception. The question serves no apparent recordkeeping need, as the po-

## C

Although JUSTICE BRENNAN does not address this issue, the booking questions sought "testimonial" responses for the same reason the sixth birthday question did: because the content of the answers would indicate Muniz's state of mind. *Ante*, at 598–599, and n. 12. See also *Estelle* v. *Smith*, 451 U. S. 454, 464–465 (1981). The booking questions, like the sixth birthday question, required Muniz to (1) answer correctly, indicating lucidity, (2) answer incorrectly, implying that his mental faculties were impaired, or (3) state that he did not know the answer, also indicating impairment. Muniz's initial incorrect response to the question about his age and his inability to give his address without looking at his license, like his inability to answer the sixth birthday question, in fact gave rise to the incriminating inference that his mental faculties were impaired. Accordingly, because the police did not inform Muniz of his *Miranda* rights before asking the booking questions, his responses should have been suppressed.

## II

## A

The Court finds in Part IV of its opinion that *Miranda* is inapplicable to Muniz's statements made in connection with the three sobriety tests and the breathalyzer examination because those statements (which were undoubtedly testimonial) were not the products of "custodial interrogation." In my view, however, the circumstances of this case—in particular, Muniz's apparent intoxication—rendered the officers' words and actions the "functional equivalent" of express questioning

lice already possessed Muniz's date of birth. The absence of any administrative need for the question, moreover, suggests that the question was designed to obtain an incriminating response. Regardless of any administrative need for the question and regardless of the officer's intent, *Miranda* warnings were required because the police should have known that the question was reasonably likely to elicit an incriminating response. *Supra*, at 610–611.

because the police should have known that their conduct was "reasonably likely to evoke an incriminating response." *Innis, supra,* at 301. As the Court recounts, *ante,* at 602–604, Officer Hosterman instructed Muniz how to perform the sobriety tests, inquired whether Muniz understood the instructions, and then directed Muniz to perform the tests. Officer Deyo later explained the breathalyzer examination and the nature of the Commonwealth's Implied Consent Law, and asked several times if Muniz understood the Law and wanted to take the examination. *Ante,* at 604. Although these words and actions might not prompt most sober persons to volunteer incriminating statements, Officers Hosterman and Deyo had good reason to believe—from the arresting officer's observations, App. 13–19 (testimony of Officer Spotts), from Muniz's failure of the three roadside sobriety tests, *id.,* at 19, and from their own observations—that Muniz was intoxicated. The officers thus should have known that Muniz was reasonably likely to have trouble understanding their instructions and their explanation of the Implied Consent Law, and that he was reasonably likely to indicate, in response to their questions, that he did not understand the tests or the Law. Moreover, because Muniz made several incriminating statements regarding his intoxication during and after the roadside tests, *id.,* at 20–21, the police should have known that the same tests at the booking center were reasonably likely to prompt similar incriminating statements.

The Court today, however, completely ignores Muniz's condition and focuses solely on the nature of the officers' words and actions. As the Court held in *Innis,* however, the focus in the "functional equivalent" inquiry is on "the perceptions of the suspect," not on the officers' conduct viewed in isolation. 446 U. S., at 301. Moreover, the *Innis* Court emphasized that the officers' knowledge of any "unusual susceptibility" of a suspect to a particular means of eliciting information is relevant to the question whether they should have known that their conduct was reasonably likely to elicit

an incriminating response. *Id.*, at 302, n. 8; *supra*, at 610–611. See also *Arizona* v. *Mauro*, 481 U. S. 520, 531 (1987) (STEVENS, J., dissenting) (police "interrogated" suspect by allowing him to converse with his wife "at a time when they knew [the conversation] was reasonably likely to produce an incriminating statement"). Muniz's apparent intoxication, then, and the police's knowledge of his statements during and after the roadside tests compel the conclusion that the police should have known that their words and actions were reasonably likely to elicit an incriminating response.[2] Muniz's statements were thus the product of custodial interrogation and should have been suppressed because Muniz was not first given the *Miranda* warnings.

## B

The Court concedes that Officer Hosterman's directions that Muniz count aloud to 9 while performing the "walk and turn" test and to 30 while performing the "one leg stand" test constituted custodial interrogation. *Ante*, at 603, and n. 17. Also indisputable is the testimonial nature of the responses sought by those directions; the content of Muniz's counting, just like his answers to the sixth birthday and the booking questions, would provide the basis for an inference regarding his state of mind. Cf. *ante*, at 599; *supra*, at 612. The Court finds the admission at trial of Muniz's responses permissible, however, because they were not incriminating "except to the extent [they] exhibited a tendency to slur words,

---

[2] An additional factor strongly suggests that the police expected Muniz to make incriminating statements. Pursuant to their routine in such cases, App. 28–29, the police allotted 20 minutes for the three sobriety tests and for "observation." Because Muniz finished the tests in approximately 6 minutes, the police required him to wait another 14 minutes before they asked him to submit to the breathalyzer examination. Given the absence of any apparent technical or administrative reason for the delay and the stated purpose of "observing" Muniz, the delay appears to have been designed in part to give Muniz the opportunity to make incriminating statements.

which [the Court already found to be] nontestimonial [evidence]." *Ante*, at 603, n. 17. The Court's conclusion is wrong for two reasons. First, as a factual matter, Muniz's responses *were* incriminating for a reason other than his apparent slurring. Muniz did not count at all during the walk and turn test, supporting the inference that he was unable to do so.[3] And, contrary to the Court's assertion, *ibid.*, during the one leg stand test, Muniz incorrectly counted in Spanish from one to six, skipping the number two. Even if Muniz had not skipped "two," his failure to complete the count was incriminating in itself.

Second, and more importantly, Muniz's responses would have been "incriminating" for purposes of *Miranda* even if he had fully and accurately counted aloud during the two tests. As the Court stated in *Innis*, "[b]y 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial." 446 U. S., at 301, n. 5. See also *Miranda*, 384 U. S., at 476–477 ("The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'"). Thus, *any* response by

---

[3] The Commonwealth could not use Muniz's failure to count against him regardless of whether his silence during the walk and turn test was itself testimonial in those circumstances. Cf. *ante*, at 603, n. 17. A defendant's silence in response to police questioning is not admissible at trial even if the silence is not, in the particular circumstances, a form of communicative conduct. *Miranda* v. *Arizona*, 384 U. S. 436, 468, n. 37 (1966) ("[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation"). Cf. *Griffin* v. *California*, 380 U. S. 609, 615 (1965) ("[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt").

Muniz that the prosecution sought to use against him was incriminating under *Miranda*. That the majority thinks Muniz's responses were incriminating only because of his slurring is therefore irrelevant. Because Muniz did not receive the *Miranda* warnings, then, his responses should have been suppressed.

## III

All of Muniz's responses during the videotaped session were prompted by questions that sought testimonial answers during the course of custodial interrogation. Because the police did not read Muniz the *Miranda* warnings before he gave those responses, the responses should have been suppressed. I would therefore affirm the judgment of the state court.[4]

---

[4] I continue to have serious reservations about the Court's limitation of the Fifth Amendment privilege to "testimonial" evidence. See *United States* v. *Mara*, 410 U. S. 19, 32–38 (1973) (MARSHALL, J., dissenting). I believe that privilege extends to *any* evidence that a person is compelled to furnish against himself. *Id.*, at 33–35. At the very least, the privilege includes evidence that can be obtained only through the person's affirmative cooperation. *Id.*, at 36–37. Of course, a person's refusal to incriminate himself also cannot be used against him. See n. 3, *supra*. Muniz's performance of the sobriety tests and his refusal to take the breathalyzer examination are thus protected by the Fifth Amendment under this interpretation. But cf. *ante*, at 604–605, n. 19. Because Muniz does not challenge the admission of the video portion of the videotape showing the sobriety tests or of his refusal to take the breathalyzer examination, however, those issues are not before this Court.