COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-352-CR

 

 

DEWAYNE LEE WELLS                                                         APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 371ST DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------








A jury convicted Appellant
Dewayne Lee Wells of injury to a child, and, after finding the deadly weapon
and the enhancement allegations true, assessed his punishment at sixty years= confinement in the Institutional Division of the Texas Department of
Criminal Justice.  The trial court
sentenced him accordingly.  In six points
on appeal, Appellant argues that the trial court committed reversible error by
admitting his pretrial statement, by allowing the State to comment on his
pretrial silence, and by allowing the prosecutor to show the jury notes that
the prosecutor had taken during testimony and challenged the sufficiency of the
evidence to support the deadly weapon finding. 
Because we hold that there is no reversible error and that the evidence
is sufficient to support the deadly weapon finding, we affirm the trial court=s judgment.

Background Facts

On May 28, 2004, the Fort
Worth Fire Department and Medstar Ambulance responded to an Aunconscious baby@ call made
by Regina Wells, Appellant=s wife.  When the firefighters
arrived at the Wellses= home, they
found the Wellses=
nineteen-month-old son, Joseph, unconscious, with bruising around his
neck.  Regina had not been at home when
the injury occurred.  Appellant and
Regina told the firefighters that Joseph=s injuries were caused when their older child fell on him.  The paramedics took Joseph to Cook Children=s Hospital with Regina. 
Appellant took their older child and drove to his mother=s apartment in Euless.








Joseph was pronounced brain
dead after he arrived at the hospital. 
The doctor who treated Joseph testified at trial that Joseph=s death was caused by blunt force trauma to the head and estimated
that several hours had passed between the trauma and the brain death.

A Fort Worth police officer,
Detective Steve Benjamin, obtained an arrest warrant for Appellant and located
Appellant at his mother=s home.  The detective was accompanied by Euless
police officers.  When Appellant answered
the door, the detective identified himself and told Appellant, AI=d like to
talk to you.@  Appellant stated, AI don=t want to
talk to you,@ and
attempted to close the door.  Detective
Benjamin prevented the door from closing and took Appellant into custody.  A Euless police officer transported Appellant
to Fort Worth, where he was transferred to the car of a Fort Worth police
officer.     Detective Benjamin testified
that while Appellant was in the Fort Worth police car, he asked why he was
being arrested, and Detective Benjamin told Appellant that he was being arrested
for injury to a child because of Joseph=s injuries.  Appellant stated
that he Adidn=t hurt
Joseph.  S[.W.] jumped on him.@  On voir dire, Detective
Benjamin testified that he told Appellant, AI=m not going
to take that.  That=s nonsense.  If you want to talk
to me about what really happened, I=ll be glad to sit down and talk with you; otherwise, you=re going to jail.@  Appellant stated that he would
talk to the detective and tell the detective what happened.








Appellant was then taken to
the detective=s office at
Alliance for Children.  The detective
read Appellant his Miranda[2]
rights and questioned Appellant for several hours.  Appellant refused to provide a written
statement, but he did sign the statement that Detective Benjamin typed for him,
which provides that he found his son S.W. jumping in Joseph=s crib.  The statement further
provides that Appellant carried Joseph into the living room, where Appellant=s legs started to shake, and he fell down, but he did not remember if
he fell on Joseph.  Contrary to Appellant=s statement, Regina testified at trial that Appellant had told her
that Joseph had been Afussy,@ that Appellant had been unable to quiet him down, and that Appellant
had shaken Joseph and thrown him on the floor.

Appellant=s Statements

In his first two points,
Appellant contends that trial court erred by admitting his custodial statements
because they were taken after Appellant had invoked his right to remain silent
and because they were involuntary due to law enforcement=s promises and threats.








Miranda v. Arizona requires that a person
in custody be informed of his rights, know his rights, and voluntarily waive
his rights before a confession is admissible.[3]  Warnings are ineffective and the confession
is inadmissible at trial when the officer waits until mid-interrogation to give
the warnings.[4]  When a defendant invokes his right to remain
silent, interrogation must cease.[5]  Interrogation Arefers . . . to any words or actions on the part of the police (other
than those normally attendant to arrest and custody) that the police should
know are reasonably likely to elicit an incriminating response from the
suspect.@[6]  When a defendant invokes his
right to remain silent, Aany
statement taken after[ward] . . . cannot be other than the product of
compulsion, subtle or otherwise.  Without
the right to cut off questioning, the setting of in-custody interrogation
operates on the individual to overcome free choice in producing a statement
after the privilege has been once invoked.@[7]  Use of an involuntary
confession violates due process.[8]








Appellant unequivocally told Detective Benjamin that he did not want
to talk to him at his mother=s Euless apartment.  Unknown to
Appellant at that time, Benjamin had a warrant for Appellant=s arrest.  The police took
Appellant into custody.  After being
transported in a Euless police car and then being transferred to a Fort Worth
police car, Appellant asked why he was being arrested.  In reply, Benjamin told him the charges.  Appellant then denied that he had injured
Joseph and claimed that his older son had done it.  Benjamin responded, AI=m not going
to take that.  That=s nonsense.  If you want to talk
to me about what really happened, I=ll be glad to sit down and talk with you; otherwise, you=re going to jail.@  Appellant later signed a
statement typed by the police.  Both
Appellant=s oral
statement made in the car and the written statement were admitted at trial.








The trial court held that the oral statement Appellant made in the
police car was freely and voluntarily given and not in response to custodial
interrogation.  We agree.  The officer=s action of informing Appellant of the charges against him when asked
was part of the officer=s routine,
administrative duty.[9]  The officer=s response to Appellant=s question was not designed to elicit a response from Appellant;
therefore, it was not the functional equivalent of custodial interrogation.[10]  Because Appellant=s oral statement in the car was volunteered, we hold that the trial
court properly denied Appellant=s motion to suppress that statement.








Regarding the written statement, the trial court held that it complied
with article 38.22 of the Texas Code of Criminal Procedure,[11]
that the warnings were given, and that the statement was admissible.  Appellant argues that he did not voluntarily
reinitiate the conversation and thereby waive his right to remain silent.  Rather, he argues that he acquiesced to the
alternatives Benjamin offered: either talk about the offense and relate Awhat really happened@ or go to jail.  Appellant
argues that the obvious implication of Benjamin=s words was that if Appellant talked and told the police what they
wanted to hear, perhaps he would be released. 
The subsequent interrogation lasted several hours.   The State argues that Appellant=s only voluntariness complaint before the trial court was that
Appellant did not reinitiate a conversation with Detective Benjamin after telling
him that he did not want to talk to him. 
The State contends that Appellant has not preserved for appellate review
the federal due process violation and the coercion complaints found in
Appellant=s
brief.  The State is incorrect.  Appellant addressed the issues of promises,
the alternatives of giving a statement or going to jail, and federal and state
constitutional due process provisions in the trial court.  It is true that the only cases he
specifically addressed were Miranda and Edwards v. Arizona,[12]
but the record is clear that the trial court understood Appellant=s complaints and that they are the same complaints he raises on
appeal.








When determining whether a statement should have been excluded as a
matter of federal constitutional law, we decide whether the confession was
voluntary or coerced.[13]  Our review examines the totality of the
circumstances, not whether the defendant would have refused to confess but for
the promise.[14]
The ultimate question is whether the defendant=s will was overborne.[15]  A promise can render a confession invalid
under article 38.21 of the Texas Code of Criminal Procedure if it is Apositive, made or sanctioned by someone in authority, and of such an
influential nature that it would cause a defendant to speak untruthfully.@[16]

Although the officer offered Appellant alternatives, giving a
statement or going to jail, he did so in response to Appellant=s volunteered statement that he did not injure Joseph.  The alternatives were artfully phrased, but
they did not include release.  Rather,
Appellant=s
alternatives were to go to the police station and give a statement or to go
directly to jail.  Never did the officer
suggest that Appellant would be released. 
All the officer actually offered Appellant was a detour on his way to
jail.  We do not construe the officer=s statement as a threatCAppellant had already been arrested and was being transported to jail
when the statement was made.[17]  The officer=s offer did not rise to such a level that it would coerce Appellant
into giving a statement or overcome his desire to keep silent.








After Appellant arrived at the police station, he was properly warned
in connection with his written statement. 
No threats or promises were made at the police station in connection
with Appellant=s written
statement.

Considering all the circumstances surrounding the written statement,
we hold that the trial court did not err by holding that the written statement
was made after Appellant was appropriately warned, that the written statement
was voluntary and in compliance with Article 38.22, and, implicitly, that
Appellant voluntarily waived his right to remain silent.  Consequently, we hold that the trial court
did not err by admitting Appellant=s written statement.  We
overrule Appellant=s first two
points.

Pretrial Silence

In his third and fourth points, Appellant contends that the trial
court erred by overruling his objections to the comments on Appellant=s pretrial silence when the detective testified that he talked to
Appellant from outside the apartment and again when the detective testified, AI can say what he said . . . ,@ both referring to Appellant=s conduct at the time of arrest.








When the detective arrived at Appellant=s home, Appellant tried to prevent his entering and told him that he
did not want to talk with him.  At trial,
there was an extended hearing outside the presence of the jury regarding the
admissibility of Appellant=s statements to the detective at the time of the entry and
arrest.  The trial judge stated
unequivocally that the statements were not admissible.  The detective was present and participated in
the hearing.  As Appellant pointed out,
there was no way the detective could have misunderstood the trial court=s ruling.  Yet, when the jury
returned, the following occurred:

Q.  Did you attempt to make
entrance into that apartment?

A.  I placed my foot in the
door, but I did not walk B

[Defense
Counsel]:  Objection to the officer
volunteering information, Your Honor, C 

 

THE
COURT:  Sustained.

 

[Defense
Counsel]:  C
instead of answering questions.

 

Q.  When you tried to go in the apartment, what
happened?

 

A.  I can say what he said or C

Appellant objected immediately and specifically that the
detective  attempted to subvert the trial
court=s ruling by making clear to the jury that Appellant had said something
that had been suppressed.  But there was
no comment on Appellant=s pretrial
silence because the detective only informed the jury that Appellant made some
kind of statement that the jury was not allowed to hear.  Although we as the reviewing court know that
his statement was an invocation of his right to remain silent, it is not clear
that the jury understood that Appellant=s statement was an invocation of that right.








Comments on pretrial silence violate Appellant=s right to remain silent, which is protected both by the Fifth
Amendment to the United States Constitution and by  Article I, Section 10 of the Texas
Constitution.[18]  In discussing a comment on a defendant=s failure to testify, which also includes the invocation of the right
to remain silent after warnings, the Texas Court of Criminal Appeals explained,

Article 38.08 prohibits any comment on
the right of an accused person to remain silent or his failure to testify.  In order to constitute a violation of Article
38.08, the language must be either manifestly intended, or of such a character
that the jury would naturally and necessarily take it to be a comment on the
defendant=s failure to
testify.  The challenged comment must be
viewed from the standpoint of the jury and the language must be more than an
implied or indirect allusion to the defendant=s silence.[19]








Similarly, a comment on Appellant=s pretrial silence must be manifestly intended, or of such a
character,  that the jury would naturally
and necessarily take it to be a comment on the defendant=s invocation of his right to remain silent before trial.[20]  The detective=s statement was not one that the jury would naturally and necessarily
take as a comment on Appellant=s invocation of his right to pretrial silence.  We therefore hold that the trial court did
not err by admitting the testimony and overrule Appellant=s third and fourth points.

The Prosecutor=s Notes








In his fifth point, Appellant contends that the trial court abused its
discretion by allowing the prosecutor to act as a second court reporter and
present his notes to the jury during trial. 
Appellant argues that there is only one official transcription of trial
testimony, and that is the transcription provided by the official court
reporter.  In the case now before this
court, the prosecutor made his own notes and provided them to the jury by means
of projection onto a screen.  The notes
were not admitted into evidence.  The
State argues that Appellant failed to lodge a timely objection because, A[a]lthough it is difficult to determine from the record, it appears as
though portions of the projected notes could have been used with [the first two
witnesses].@  Appellant objected after two witnesses had
testified.  A defendant must object as
soon as the ground for objection becomes apparent.[21]  Because, as the State points out, it is
unclear from the record when the ground for the objection first became
apparent, and because Appellant represents without contradiction that he
objected as soon as he realized what the State was doing, we hold that the
objection was timely.

As to the merits of the complaint, the State argued at trial and on
appeal that a lawyer may write on a poster points from a witness=s testimony that the lawyer wants to emphasize.  Projecting notes on a screen is simply a
technologically advanced version of the same practice.  We agree. 
The trial court has discretion to allow visual aids and charts that
summarize the admitted evidence for the jury.[22]  Because such summaries of a witness=s testimony are permitted, we overrule Appellant=s fifth point.

Deadly Weapon Finding

In his sixth point, Appellant contends that the evidence is
insufficient to support a finding of a deadly weapon.  Within his discussion, he also argues that
there is no evidence to support the finding. 
We will therefore address both legal and factual sufficiency of the
evidence.  A deadly weapon is anything
that in the manner of its use or intended use is capable of causing death or
serious bodily injury.[23]








The complainant, Joseph, was a nineteen-month-old child who had braces
for his legs and could neither walk nor crawl. 
Appellant admitted to his wife that he had gotten frustrated while
caring for Joseph.  Appellant shook
Joseph and threw him on the floor, and as a result, Joseph was limp but
breathing.  When Regina Wells returned
home, she found the door locked with a deadbolt and, inside the apartment,
Joseph, lying in his crib.  Joseph was
having trouble breathing, and his half-open eyes were glazed.  When Joseph arrived at the hospital, he
appeared brain dead to the treating physician. 
Dr. Marshall found that Joseph had severe brain swelling and an impact
bruise on his forehead.  Bruises on both
sides of Joseph=s neck
looked like fingerprints or pressure marks from a hand.  Dr. Marshall estimated that several hours had
passed between the injury to Joseph=s head and the brain death.








Dr. Marshall testified that he was sure that Joseph had endured blunt
force trauma to his head.  Dr. Krouse of
the Tarrant County Medical Examiner=s Office also concluded that the cause of Joseph=s death was blunt force injury to the head.  Dr. Krouse found that the bruise on Joseph=s forehead bore a distinctive L-shape with a very linear edge on the
top.  He opined that that meant that the
object that struck Joseph=s head or
that Joseph=s head
struck could be relatively flat, but somewhere the object would have something
with the L-shape on it.  The bruise on
the back of Joseph=s head,
however, could have been caused by a flat surface.  It was the second major point of impact to
the head.  Dr. Krouse could not determine
which blow actually caused death.  He
agreed with Dr. Marshall that the symptoms he saw were consistent with Joseph=s striking a hard object, which could include a floor.

Dr. Krouse testified that whatever the object was, it was capable of
causing serious bodily injury or death. 
On cross-examination, Dr. Krouse repeated that the surface causing the
injury could have been anything flat, but he could not say what that surface
was.

Applying the appropriate standards of review,[24]
we hold that the evidence is both legally and factually sufficient to establish
that, as alleged in the indictment, the floor or some object unknown to the
grand jury was used as a deadly weapon. 
We overrule Appellant=s sixth point.

 

 

 








 

 

Conclusion

Having overruled Appellant=s six points, we affirm the trial court=s judgment.

 

LEE
ANN DAUPHINOT

JUSTICE

 

PANEL A:   CAYCE, C.J.; DAUPHINOT and WALKER, JJ.

DO NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  March 29, 2007

 











[1]See Tex. R. App. P. 47.4.





[2]Miranda
v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).





[3]Id. at
444-45, 86 S. Ct. at 1612.





[4]Missouri
v. Seibert, 542 U.S. 600, 617, 124 S. Ct. 2601, 2613
(2004).





[5]Miranda, 384
U.S. at 445, 86 S. Ct. at 1612.





[6]Rhode
Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689-90
(1980) (footnotes omitted).





[7]Miranda, 384
U.S. at 474, 86 S. Ct. at 1627-28.





[8]Jackson
v. Denno, 378 U.S. 368, 376, 84 S. Ct. 1774, 1780 (1964);
Brown v. Mississippi, 297 U.S. 278, 281-82, 56 S. Ct. 461, 462-63
(1936).





[9]See
Pennsylvania v. Muniz, 496 U.S. 582, 601‑02, 110 S. Ct.
2638,  2650 (1990) (holding that
questions reasonably related to the police officer=s
administrative concerns do not fall under Miranda).





[10]See
id.





[11]Tex. Code Crim. Proc. Ann. art.
38.22 (Vernon 2005).





[12]Edwards
v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981).





[13]Arizona
v. Fulminante, 499 U.S. 279, 285‑86, 111 S. Ct. 1246,
1251-52 (1991).





[14]Id.





[15]See
id. at 288, 111 S. Ct. at 1253; see also Creager v. State, 952
S.W.2d 852, 855 (Tex. Crim. App. 1997).





[16]Martinez
v. State, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004); see
also Tex. Code Crim. Proc. Ann.
art. 38.21 (Vernon 2005).





[17]See
Powell v. State, 5 S.W.3d 369, 379 (Tex. App.CTexarkana
1999, pet. ref=d)
(construing officer=s
statementCAYou
mind if I search the car . . . , or I can have my dog run around the carCwhichever
you want@Cnot Aas a
threat to coerce [the person] into consenting [to a search] but rather as an
option@), cert.
denied, 529 U.S. 1116 (2000); Ashcraft v. State, 900 S.W.2d 817,
824-25 (Tex. App.CCorpus
Christi 1995, pets. ref=d and
dism=d)
(finding officer=s
statement to Ashcraft that his mother could be held responsible for stolen
property found in her home to be a statement of fact).





[18]U.S. Const amend. V; Tex. Const. art. I, ' 10; Doyle
v. Ohio, 426 U.S. 610, 617-18, 96 S. Ct. 2240, 2244-45 (1976), Samuel v.
State, 688 S.W.2d 492, 496 (Tex. Crim. App. 1985).





[19]Bower
v. State, 769 S.W.2d 887, 906-07 (Tex. Crim. App. 1989)
(citations omitted), overruled on other grounds by Heitman v. State, 815
S.W.2d 681 (Tex. Crim. App. 1991).





[20]See
id.





[21]Lagrone
v. State, 942 S.W.2d 602, 618 (Tex. Crim. App.), cert.
denied, 522 U.S. 917 (1997).





[22]Baker
v. State, 177 S.W.3d 113, 123 (Tex. App.CHouston
[1st Dist.] 2005, no pet.); Strong v. State, 805 S.W.2d 478, 485 (Tex.
App.CTyler
1990, pet. ref=d).





[23]Tex. Penal Code Ann. '
1.07(a)(17) (Vernon Supp. 2006).





[24]See
Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979);
Hampton v. State, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005) (both
providing legal sufficiency standard of review); Watson v. State, 204
S.W.3d 404, 414-15, 417 (Tex. Crim. App. 2006); Drichas v. State, 175
S.W.3d 795, 799 (Tex. Crim. App. 2005); Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003); Johnson v.
State, 23 S.W.3d 1, 8-9, 11-12 (Tex. Crim. App. 2000); Cain v. State,
958 S.W.2d 404, 407 (Tex. Crim. App. 1997) (all providing factual sufficiency
standard of review).