**UNITED STATES of America**

v.

**Esau ZAMORA, Defendant.**

**No. 8:13–CR–398.**

United States District Court,
N.D. New York.

Signed Sept. 4, 2014.

Richard S. Hartunian, United States Attorney for the Northern District of New York, Sean K. O'Dowd, Esq., Ass't United States Attorney, of Counsel, Albany, NY.

Office of Frank Policelli, Frank Policelli, Esq., of Counsel, Utica, NY, for Defendant.

## MEMORANDUM–DECISION and ORDER

DAVID N. HURD, District Judge.

### I. INTRODUCTION

On October 11, 2013, a seven-count indictment was filed in the Northern District of New York charging defendants Esau Zamora, Gonzalo Reyes, and Manuel Zamora—Rivas with federal crimes. Specifically, Zamora is charged with bringing six illegal aliens to the United States ("Counts 1–6"), and all three defendants are charged with transporting aliens within the United States ("Count 7"). Defendants Reyes and Zamora—Rivas pleaded guilty to Count 7 in January 2014. Both have since been sentenced to time-served.

On March 3, 2014, Zamora filed a motion to suppress statements he made to United States Border Patrol agents on July 15, 2013. The parties then agreed to an adjournment of deadlines, after which Zamora supplemented his motion. He now also seeks to preclude the video deposition of Victor Mejia—Hernandez, taken pursuant to Federal Rule of Criminal Procedure 15, as well as evidence of his prior convictions and bad acts.[1] The Government opposes the supplemented motion.

A suppression hearing was conducted on August 22, 2014, in Utica, New York. The

---

1. Zamora also requests an order directing the Government to produce *Giglio* material regarding agreements made with witnesses and *Brady* material. The Government's obli-

gations and deadlines for such disclosures are already outlined in the Pretrial Scheduling Order, the Local Rules, and the Federal Rules

hearing addressed only Zamora's request to suppress statements.[2] United States Border Patrol ("USBP") agents James Northrop and Dustin Judd testified at the hearing. Zamora did not call any witnesses. Decision was reserved.

## II. *FACTUAL BACKGROUND*

The following facts are gleaned from the parties' pre-hearing submissions, the witnesses' testimony, and the exhibit admitted at the hearing.

On the night of July 14, 2013, Agent Judd—a seven-year veteran of the USBP—responded to a motion sensor activation near Churubusco, New York, on the border between the United States and Canada. A short while later, just after midnight on July 15, 2013, Agent Northrop—a five-year veteran of the USBP—pulled over a white Dodge Caravan on Route 11 in Chateaugay, New York, near the Canadian border. The van was driven by codefendant Gonzalo Reyes. Zamora was in the front passenger seat, and at least six undocumented immigrants from El Salvador were in the back seats. Everyone in the van was arrested and placed in vehicles to be transported to the USBP station. Zamora was handcuffed and placed in the back of a USBP car by himself.

Agent Judd arrived on the scene shortly thereafter and spoke with the other agents. Zamora then called to the agents through an open window of the USBP vehicle, and Agents Judd and Northrop walked over to the car. Zamora asked Agent Northrop if he could speak with a supervisor. Agent Northrop advised that a supervisor was not available at the time but asked Zamora: "[Is] there anything that I could help [you] with?" Hr'g Tr. 7:15 ("Tr.——"). The defendant asked to speak with a supervisor a second time, stating: "I really like to speak to a supervisor." Tr. 7:17–18. Agent Northrop again told him a supervisor was unavailable but asked: "What can we help you with here on the scene until we get back to the station?" Tr. 7:19–20.

Zamora then stated, "I want to take the rap for this"—meaning full blame for the crime. Tr. 7:21–23, 17:17–21. He had not been read his *Miranda* rights prior to making this statement. Agent Northrop advised him that his message would be relayed to a supervisor but did not include this statement in the narrative portion of his arrest report as it "slipped [his] mind." Tr. 11:1. Neither agent asked Zamora any further questions at the scene.

Zamora was then transported to the USBP station, where he was interviewed by Agents Judd and Matthew Boyea. The agents advised him of his *Miranda* rights, and he signed an INS Form 214 acknowl-

of Criminal Procedure. A formal order directing compliance with same is unnecessary.

**2.** In its opposition papers and during a pre-hearing conference, the Government indicated that it only intends to use the video deposition of Mr. Mejia—Hernandez if he is unavailable to testify in person at the trial. Therefore, the admissibility of the video deposition need not be addressed at this time. Similarly, the Government indicated that it does not intend to offer any evidence related to Zamora's criminal history during its case-in-chief. Therefore, as the parties were advised at the beginning of the suppression hearing, the Government is directed to provide the defendant with: (1) A list of any prior bad acts or convictions it intends to use on cross-examination in the event Zamora testifies at trial; and (2) notice of whether Mr. Mejia—Hernandez will be available to testify in person at the trial or, if not, whether the Government intends to offer the video deposition into evidence. Such notice shall be communicated to the defendant at least two weeks prior to the trial date, providing the parties sufficient time to make appropriate motions in limine.

edging that he had been read his rights and understood same. *See* Hr'g Ex. 1. Agent Judd then asked him: "Would you mind speaking to me without an attorney present?" Tr. 19:19. In response, Zamora put his hands in front of him and stated: "I want to hold off on that part." Tr. 19:21. However, he continued to speak to Agent Judd, who advised the defendant that he needed to sign the waiver portion of the INS Form 214 if he intended to continue speaking with the agents. Zamora refused to sign the waiver portion of the form but, again, started talking to Agent Judd about his role in the crime.

Agent Judd then asked Zamora several questions, to which he provided incriminating answers. He eventually declared himself "guilty as fuck." Tr. 20:25–21:1. He also claimed to be a "criminal" and admitted that he had "manipulated all of these people" into committing the instant crime. Tr. 21:1–2. After approximately thirty minutes, the defendant indicated that he was tired, and the interview ended at 4:15 a.m.

Approximately thirty minutes later, Zamora knocked on the interview room door and motioned Agent Judd back to the room. He asked to see the notes the agent had taken during the interview. Agent Judd did not repeat the *Miranda* warnings. Zamora read the notes and claimed to be upset because they "made [him] look bad." Tr. 26:8. Agent Judd did not engage the defendant in further questioning and did not document this interaction with Zamora regarding his notes in the narrative portion of his report.[3]

## III. DISCUSSION

Zamora argues that the statements he made to USBP agents on July 15, 2013, must be suppressed because he either was not issued a *Miranda* warning (statement at the scene) or had not knowingly and voluntarily waived his *Miranda* rights (statements at the USBP station).

### A. Pre–Miranda Statement

■ The Government argues that Zamora's pre-*Miranda* statement was made spontaneously, without prompting or interrogation, and is thus admissible.

■ The Fifth and Fourteenth Amendments "protect[ ] individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law-enforcement officers during in-custody questioning.' " *Pennsylvania v. Muniz*, 496 U.S. 582, 589, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) (quoting *Miranda v. Arizona*, 384 U.S. 436, 461, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). Generally, "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rosa v. McCray*, 396 F.3d 210, 220 (2d Cir.2005).

■■ For purposes of *Miranda*, custodial interrogation encompasses "both express questioning and words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to have the force of a question on the accused and therefore be reasonably likely to elicit an incriminating response." *Muniz*, 496 U.S. at 601, 110

**3.** At the end of the suppression hearing, in response to questioning from the Court, the Assistant United States Attorney advised that the USBP station in which this interview took place is not equipped to record such interviews. It is rather unfortunate, and somewhat inexplicable, that—in 2014—a USBP station does not have the technological capability to record interrogations despite the many interviews agents undoubtedly conduct there.

S.Ct. 2638; *see also Rhode Island v. Innis,* 446 U.S. 291, 300–02, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Conversely, "[n]othing in the Fifth Amendment prohibits the police from merely listening to volunteered statements, and then using those statements at trial." *United States v. Miller,* 382 F.Supp.2d 350, 370 (N.D.N.Y.2005) (Sharpe, J.).

Zamora was handcuffed and detained in a USBP vehicle, and therefore undisputably in custody, when he called out to the agents and asked to speak with a supervisor. Agent Northrop advised that no supervisor was available and asked if he wanted to say something. to Agent Northrop instead. Zamora repeated his request to speak with a supervisor, and Agent Northrop again asked if there was anything he could help him with on the scene. Only after this second prompting from Agent Northrop did Zamora utter his incriminating statement about taking the full blame for the crime.

The agents testified that they did not expect Zamora to make an incriminating statement and instead expected him to complain about his treatment or discomfort caused by the handcuffs. The agents' experience may justify such an expectation. However, there is no indication that Zamora was in any obvious discomfort or distress. After his first request for a supervisor, the agents could have simply informed him that a supervisor was unavailable and ended all discussion at that point. Instead, Agent Northrop invited Zamora to offer further information. In response, Zamora repeated his request for a supervisor—he did not make any complaint regarding his treatment or any injury. The agents could have again simply advised that no supervisor was available and ended the conversation. Or they could have read Zamora his *Miranda* rights. His repeated request for a supervisor should have alerted the agents that he wished to discuss the crime, not merely lodge a complaint.

These facts distinguish this case from the spontaneous statements uttered by the defendant in *Muniz.* Those statements, which the Supreme Court ultimately deemed admissible, were made while an officer read from a prepared script explaining a sobriety test. *Muniz,* 496 U.S. at 604–05, 110 S.Ct. 2638 ("Officer Deyo carefully limited her role to providing Muniz with relevant information about the breathalyzer test and the Implied Consent Law. She questioned Muniz only as to whether he understood her instructions and wished to submit to the test."). Here, Agent Northrop was not reading from a script and was instead prompting the defendant to explain his request to speak with a supervisor, twice.

In short, Zamora's pre-*Miranda* statement at the scene of his arrest regarding his desire to take full blame for the crime was the product of questioning that Agent Northrop knew or reasonably should have known was likely to elicit an incriminating response. Defendant's motion to suppress this statement will therefore be granted.

### B. *Post–Miranda Statements*

 The Government argues that Zamora's post-*Miranda* statements were voluntary despite his refusal to sign the waiver section of the INS Form 214. It contends that his history of interaction with law enforcement and the course of his conduct throughout the arrest and interview constitutes an implied waiver of his rights.

 When the Government asserts that a defendant has voluntarily waived his *Miranda* rights, it must prove the voluntariness of that waiver by a preponderance of the evidence. *Miller,* 382 F.Supp.2d at 370. "Only if the 'totality of the circum-

stances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). This inquiry is "directed to a defendant's state of mind, which can be inferred from his actions and statements." *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir.1993) (per curiam).

 Factors to consider when determining whether a defendant knowingly and voluntarily waived his rights include: "the characteristics of the accused, such as his experience, background, age and intelligence; the conditions of interrogation; and police conduct, such as physical abuse, handcuff restraint, and psychologically coercive tactics." *Miller*, 382 F.Supp.2d at 371. A defendant's refusal to sign a formal waiver form is not dispositive. *See United States v. Plugh*, 648 F.3d 118, 127–28 (2d Cir.2011) (notwithstanding defendant's refusal to sign a *Miranda* waiver form, he validly waived his rights "when he chose to begin speaking with custodial agents" with "a full understanding of his rights"); *Spencer*, 995 F.2d at 12 (finding knowing and voluntary waiver where defendant declined to sign a waiver form but was read and understood his *Miranda* rights, agreed to answer agents' questions, was of average intelligence, and had prior interaction with the criminal justice system).

Zamora signed the INS Form 214 acknowledging that he was read and understood his rights. He refused to sign the waiver section of the form and stated that he "wanted to hold off on that part" when asked whether he would speak to the

agents without a lawyer present.[4] He nonetheless voluntarily continued to talk and did not clearly invoke his rights before making incriminating remarks—this despite Agent Judd's admonition that he should sign the waiver form if he intended to continue speaking. Further, Zamora was not handcuffed during the interview, which lasted only thirty minutes and ended when he claimed to be tired. Moreover, there are no allegations or indications of physical abuse or psychological coercion. Finally, in light of defendant's motion to preclude various prior convictions and bad acts, it appears that he has had significant contact with the criminal justice system.

In sum, the totality of the circumstances surrounding the interrogation shows that Zamora understood his *Miranda* rights and made a voluntary, uncoerced decision to waive those rights and continue to speak with Agent Judd. Accordingly, his motion to suppress the post-*Miranda* statements uttered during the interview at the USBP station will be denied.

## IV. CONCLUSION

Zamora's pre-*Miranda* statement, uttered to Agent Northrop at the scene of his arrest, was the product of questioning that the agent knew or reasonably should have known was likely to elicit an incriminating response. That statement must be suppressed. Conversely, Zamora's post-*Miranda* statements, uttered to Agent Judd during the interview at the USBP station, were given voluntarily after the defendant knowingly waived his rights. Those statements are therefore admissible at trial.

Therefore, it is

---

**4.** It is not entirely clear whether Zamora was expressing a desire to "hold off" on talking to the agents or merely wanted to "hold off" on signing the waiver portion of the form. This is irrelevant, however, in light of his voluntary choice to continue speaking with Agent Judd thereafter.

ORDERED that

1. Defendant's supplemented motion to suppress and for omnibus relief (ECF Nos. 69, 89) is GRANTED in part and DENIED in part;

2. Defendant's pre-*Miranda* statement uttered at the scene of his arrest is SUPPRESSED;

3. Defendant's post-*Miranda* statements uttered during the interview at the Border Patrol station are NOT SUPPRESSED and are admissible at trial;

4. The trial in this matter shall commence with jury selection at 9:30 a.m. on October 14, 2014, in Utica, New York;

5. The Government shall provide defense counsel, on or before September 30, 2014, with: (1) A list of any prior bad acts or convictions it intends to use on cross-examination in the event defendant Zamora testifies at trial; and (2) notice of whether Victor Mejia—Hernandez will be available to testify in person at the trial or, if not, whether the Government intends to offer his video deposition into evidence; and

6. Pre-trial submissions (including proposed voir dire, trial briefs, witness and exhibit lists, proposed jury charge and verdict form, and any stipulations or motions in limine) shall be filed on or before noon on October 6, 2014.

IT IS SO ORDERED.