# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CEDRIC LAMONT LACEY,

        Defendant-Appellant.

UNPUBLISHED
November 29, 2016

No. 327728
Wayne Circuit Court
LC No. 14-005649-01-FH

Before: M. J. KELLY, P.J., and MURRAY and BORRELLO, JJ.

PER CURIAM.

A jury convicted defendant of unlawfully driving away an automobile (UDAA), MCL 750.413, larceny of personal property valued at $1,000 or more, but less than $20,000, MCL 750.356(3)(a), larceny in a building, MCL 750.360, and providing false information to a peace officer, MCL 750.479c(2)(c). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to concurrent prison terms of 35 months to 10 years each for the UDAA and larceny in a building convictions, 30 months to 4 years for the larceny of personal property conviction, and one to two years for the providing false information conviction. Defendant appeals as of right. For the reasons set forth in this opinion, we affirm.

## I. FACTS

Defendant's convictions arise from his conduct in driving away 75-year-old Ray Naso's 2003 Chrysler Town and Country minivan from the MGM Grand Casino parking garage in Detroit. The prosecution's theory at trial was that on June 4, 2014, defendant was walking around the parking garage, observed and entered Naso's unlocked minivan, used a key fob that was inside the van, and drove the minivan out of the garage. On June 15, 2014, when defendant returned to the parking garage while driving the van, the vehicle license plate alerted security that the van was back on the property. Upon defendant's arrest, the police found the key fob for the van in his pants pocket. Defendant thereafter gave the police false names and denied having recently been at the casino; later, after being advised of his constitutional rights, defendant denied driving the van onto the premises. The prosecution presented video recordings from the casino's surveillance camera for both June 4 and 15, and video of defendant providing the detective with false names. The defense theory at trial was that Naso, who died before trial, gave defendant permission to drive the minivan.

-1-

Shronda Butler testified that on June 5, 2014, she was working as a surveillance supervisor at the MGM Grand Detroit. She was responsible for reviewing video, preparing reports, and conducting investigations. The casino's surveillance system included approximately 2,000 cameras and ran 24 hours each day. On June 5, at approximately 12:30 a.m., she received a call that a patron, Naso, could not locate his vehicle, a 2003 Chrysler Town and Country minivan. After receiving the call, Butler pulled up live coverage, using the security camera near Naso's location. She observed Naso standing with an MGM security officer where Naso had parked his minivan. Butler backtracked on the video to when the minivan was captured parking at 7:02 p.m. As a series of video clips were played for the jury, Butler described the minivan pulling into the parking structure and parking on the seventh level of the self-parking garage at 7:02 p.m., and Naso get onto elevators that lead to the casino. At 7:18 p.m., an individual entered the stairwell on the ground level of the MGM parking garage and proceeded up, through successive levels of the parking garage, to the fifth level. Ultimately, the person walked up to Naso's minivan, walking alongside the vehicle, walked away, and then walked back up to it again. When the person walked by the minivan the second time, the lights on the minivan came on as if someone had a remote control to open the doors. At 7:39 p.m., the minivan could be seen leaving the parking garage. Nothing in the videos, such as breaking glass, showed that the minivan had been damaged.

Butler explained that she put the license number of the minivan into MGM's License Plate Recognition system (LPR). The LPR alerts if a vehicle with the entered license plate number comes back onto MGM property. The alarm immediately triggers in the surveillance department.

Richard Faria was working as a security officer at the MGM on June 5, 2014. Faria explained that at approximately 12:30 a.m., he was approached by a patron who needed help finding his vehicle. Naso's voice was quivering, he was shaking, and he appeared nervous and scared. As a result of talking to Naso, Faria called dispatch and had them send a report writer and a mobile unit to assist Naso in finding his car. Within a few minutes, the security reporting officer, John Dembowski, and a mobile unit operator, Kevin Snow, arrived and helped Naso.

Veronica Jones-Davis testified that on June 15, 2014, she was working as a surveillance operator at MGM. On June 15, an LPR audible siren alerted the surveillance team that a particular license plate, attached to the stolen minivan, had entered the MGM parking garage. From her surveillance station, Jones-Davis tracked the minivan through the MGM garage and observed a man, later identified as defendant, exit the minivan on level one of the garage. Security personnel were contacted and a security supervisor, James Little, met defendant on level two of the garage. Jones-Davis continued monitoring defendant as he took the elevator down to level one and exited the MGM garage and went outside.

Security supervisor Little testified that after being notified about the LPR alert for a stolen vehicle on June 15, he, accompanied by another supervisor and two additional security officers, went to the garage and made contact with defendant. Defendant was unable to produce any identification. Little informed defendant that patrons must have proper identification to be on MGM property. Defendant told Little that he was at the casino with his sister.

Michigan State Police (MSP) Det. John Keating and his partner Det. Specialist Andrew Hlinka both testified that on June 15, 2014, at 2:30 p.m., they received an LPR alert for a stolen vehicle. Det. Hlinka was already at the casino and Det. Keating was in route there. They were in an undercover police vehicle and had remained in constant contact with the surveillance unit that was tracking defendant's location. They approached defendant outside the casino and effectuated an arrest for driving a stolen vehicle. Upon searching defendant, Det. Keating found a key and key fob for a Chrysler vehicle in defendant's front pants pocket. The detectives transported defendant to a holding cell in the casino to process him.

The prosecution played a video recording of Det. Keating asking defendant questions and attempting to ascertain his identity. Defendant first gave the name Cedric Johnson, a birthdate, and an address. The detectives left and walked the short distance to the MSP room to put the information into their database. When they were unable to verify defendant's identity, they returned to the holding cell and Det. Keating asked defendant for his "real name," explaining that they needed to know his identity. Defendant gave the name Cedric Delano Lamont. They were unable to find a match for that name. At that juncture, the detectives went to the parking garage and confirmed that the key fob taken from defendant actually opened the minivan. There was no damage to the minivan. They did not locate any identification in the van, but on the front passenger seat was a gray hooded sweatshirt with a graphic design on the front and wings and a crown on the back. The detectives returned to the holding cell and defendant gave a third false name, Derek Leon Lacey, and a birthdate. The detectives' supervisor, MSP Det. Sgt. Marva Moore, testified that she joined the detectives at approximately 4:30 p.m. in an attempt to ascertain defendant's identity, and was present when defendant gave the false name Derek Lacey. She ran the search of the last name he provided.

In the meantime, Det. Hlinka contacted the Border Patrol so that defendant could be fingerprinted using their mobile biometric scanner, which immediately provides an identification from a fingerprint. Once Border Patrol Agent Shawn Willingford arrived, defendant was taken to the parking garage and fingerprinted in the back seat of the border patrol agent's car, which led to the detectives ascertaining defendant's identity. After ascertaining defendant's true identity, they briefly returned to the holding cell while they ran their own search of defendant. Defendant was then given his *Miranda*[1] rights and interviewed. Det. Hlinka explained that defendant was not read his *Miranda* rights earlier because he was not asked any substantive and incriminating questions; questions were asked only to ascertain his identity.

Det. Hlinka interrogated defendant, Sgt. Moore was present, and Det. Keating was "in and out doing other things." During the interview, defendant never offered any explanation for why he was driving the minivan. Defendant denied driving the minivan into the MGM garage or ever being inside the vehicle. Defendant stated that on the previous night, at approximately 11:00 p.m., his sister had driven him to MGM in her silver Chrysler minivan. When confronted with the keys to the minivan, defendant stated that he found the key fob in the MGM parking structure at approximately 8:00 a.m. that morning. He stated that he had been gaming all night

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

and was outside getting some fresh air when security observed him in the MGM garage. When Det. Hlinka showed defendant the sweatshirt, he denied that it belonged to him. At the end of the interview, however, defendant asked if he could have his sweatshirt back because he was cold. After the interview, defendant was transported to the Detroit Detention Center.

At trial, MSP forensic biologist Jennifer Jones testified that she performed DNA analysis on the buccal swabs collected from the gray sweatshirt and a reference sample from defendant. She explained that "[t]he major DNA types obtained from the swabs from the sweatshirt matched the DNA types obtained from the known buccal samples from [defendant] at 15 of the 16 locations" considered.

The prosecution also presented the testimony of Naso's family members. Deborah Rakijash, Naso's daughter, testified that she was very close to her father and saw him three or four times each week. Naso lived in Clinton Township, approximately four miles from Deborah's home. Although she had driven her father's minivan, he was always in the van with her; he never let her borrow it without him being there. Based on her personal observation, he never let anyone borrow his minivan. Her father had never worn a sweatshirt like the one recovered from the van. Deborah's husband, Peter Rakijash, also testified that Naso never allowed him to use the vehicle without him being present and Peter was not aware of Naso letting anyone borrow his minivan.

Robert Blaurok, Naso's brother-in-law, testified that he was very close with Naso and familiar with Naso's minivan. Blaurok and Naso met at Detroit casinos approximately twice a month. They "had a ritual" of parking on the seventh floor of the MGM because it was easier to find parking spaces. He identified the parking spot in the video recording as the location where Naso usually parked. Blaurok did not recognize defendant and did not recognize the gray sweatshirt as belonging to Naso.

Defendant testified on his own behalf and denied driving Naso's van without his permission. Defendant claimed that he had known Naso since he was 18 years old; they met when defendant was working as a manager at a Detroit Kentucky Fried Chicken restaurant and Naso came in as a customer. They kept in contact over the years, although defendant had never met Naso's daughter or son-in-law. Defendant claimed that during the Memorial Day weekend in 2014, he retrieved the keys from Naso. He next saw Naso on June 4, 2014, which was the "day the car got stole—allegedly got stole." On that day, he and Naso met in the parking garage at MGM and they drove to the Motor City Casino. Defendant denied telling the police that he found the keys for the minivan.

On cross-examination, defendant claimed that Naso visited him in prison and they also communicated by cell phone. Defendant admitted driving Naso's van on June 4. He explained that the video recording actually showed that Naso stopped him in the parking structure, told him he was going to the other casino, he got in the minivan, Naso slid to the passenger seat, and they drove out of the parking garage together. They met at MGM and then drove over to the Motor City Casino in Naso's minivan. They left Naso's minivan parked at the Motor City Casino until June 15, when defendant drove it back to MGM. Defendant admitted that he drove the minivan back to MGM on June 15. He also admitted that he did not tell the MSP detectives his correct name after he was arrested. Defendant denied that he owned the sweatshirt that was found in the

van. Defendant acknowledged that he was previously convicted of breaking and entering a vehicle, causing damage to the vehicle.

Defendant was convicted and sentenced as set forth above. This appeal ensued.

## II. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the evidence was insufficient to support his convictions. When ascertaining whether sufficient evidence was presented at trial to support a conviction, this Court must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012). Circumstantial evidence and reasonable inferences arising from the evidence can constitute satisfactory proof of the elements of the crime. *People v Brantley*, 296 Mich App 546, 550; 823 NW2d 290 (2012).

### A. LARCENY AND UDAA OFFENSES

The essential elements of UDAA are (1) driving or taking away an automobile, (2) without the owner's consent. *People v Cain*, 495 Mich 874; 838 NW2d 150 (2013). The elements of larceny in a building are (1) an actual or constructive taking of goods or property, (2) a carrying away or asportation, (3) the carrying away must be with felonious intent, (4) the goods or property must be the personal property of another, (5) the taking must be without the consent and against the will of the owner, and (6) the taking must occur within the confines of the building. *People v Sykes*, 229 Mich App 254, 278; 582 NW2d 197 (1998). Lastly, the elements of larceny are (1) the taking of someone else's property without consent, (2) movement of the property, and (3) the specific intent to steal or permanently deprive the owner of the property. *People v Cain*, 238 Mich App 95, 120-121; 605 NW2d 28 (1999). Additionally, MCL 750.356(3)(a) requires a showing that the personal property had a value of $1,000 or more, but less than $20,000. For all three offenses, defendant challenges only the consent element.

The prosecution presented significant circumstantial evidence that defendant's taking of the minivan was not consensual. Although Naso died before trial, his family members testified that he never loaned his minivan to anyone, including close family members. Defendant admitted driving Naso's minivan out of the MGM parking structure on June 4, 2014, and driving it back into the structure on June 15, 2014. Surveillance video captured Naso parking his minivan in the casino garage on June 4, and then walk into the casino. Minutes later, a man walked up to and alongside Naso's minivan, walked away, and then approached it again. When the man approached the minivan the second time, the lights flashed as if someone had used a remote control to unlock the doors. The minivan was then captured on video leaving the garage. Naso's brother-in-law testified that Naso would sometimes put his spare keys in the center console, and he specifically recalled Naso putting the keys in the console in May 2014. Defendant admitted that he had the minivan's key fob, which was found in his possession at the time of his arrest. Additional surveillance video showed that a few hours after Naso parked his minivan, he returned to where he had parked it and it was not there. As Naso spoke to a security officer, he was shaking and appeared nervous and scared to the officer. The casino entered the minivan's license plate number into its LPR and arranged to have Naso transported home. On June 15, defendant drove the minivan back into the parking garage and parked it. After being

advised of his constitutional rights, defendant denied driving the minivan or ever being inside it, and claimed that he had found the minivan's key fob in the garage earlier that day. At trial, however, he testified that he had driven the minivan with Naso's consent.

The reasonable inferences arising from the evidence were sufficient to enable the jury to find beyond a reasonable doubt that defendant took Naso's minivan without Naso's consent. The description of defendant's conduct leading up to and immediately preceding his act of driving away in the vehicle supported an inference that the vehicle was taken without the owner's consent. Further, the jury could infer from the description of Naso's frightened and nervous demeanor after he returned to the location where he had parked his vehicle, which was no longer there, that Naso was surprised and upset that the vehicle was missing, and that he had not given anyone permission to use or take the vehicle. Such an inference is further supported by the evidence that Naso never allowed even close family members to use his vehicle without him being present.

Although defendant argues that different inferences could be drawn from the evidence, it is the responsibility of the trier of fact to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences. *People v Hardiman,* 466 Mich 417, 428; 646 NW2d 158 (2002); *People v Scotts*, 80 Mich App 1, 9; 263 NW2d 272 (1977). The same challenges regarding the element of consent that defendant raises on appeal were presented to the jury during trial and argued to the jury during closing argument. This Court does not interfere with the jury's role of determining issues of weight and credibility, or resolving conflicts in the evidence. *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992).

Defendant argues that the prosecution relied on hearsay evidence to prove lack of consent. Defendant cites evidence that Dembowski gave Naso a crime reporting number, that Ramsey arranged transportation to take Naso home, and that someone entered the minivan's license plate number into MGM's LPR system. Defendant claims that, through this evidence, the prosecution essentially introduced Naso's hearsay statement to security that someone stole his vehicle. Defendant's argument lacks merit. First, there was no testimony that Naso stated "my minivan was stolen," to anyone. Instead, Faria testified that Naso approached and requested help locating his vehicle.

Second, even assuming that Naso did state that his vehicle was stolen, or that the prosecution implied that Naso made the statement, that statement would have been admissible as an excited utterance under MRE 803(2), which allows introducing of an out-of-court statement if the statement is one "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." More specifically, a statement falls within the excited utterance exception if it meets the following three criteria: "(1) it must arise out of a startling occasion; (2) it must be made before there has been time to contrive and misrepresent; and (3) it must relate to the circumstances of the startling occasion." *People v Gee*, 406 Mich 279; 278 NW2d 304 (1979) (citations omitted). Here, Faria testified that at 12:30 a.m. on June 5, 2014, Naso approached him and requested help locating his vehicle. Naso's voice was quivering, he was shaking and he appeared nervous or scared. These circumstances support that Naso's statements arose out of a startling occasion—i.e. Naso discovered that his vehicle was not where he left it, it was at a late hour, and Naso was stranded alone at the casino without

-6-

a means of returning home. *Id.* Additionally, the statement was made contemporaneously with Naso learning that his vehicle was missing, thus, it was made before there had been time to fabricate or misrepresent. *Id.* Finally, the statement did relate to the circumstances of the startling occasion—i.e. Naso's statement concerned the startling event—his missing vehicle. *Id.* Accordingly, Naso's statement was admissible under MRE 803(2) as an excited utterance.

Alternatively, an out-of-court statement is not hearsay if it is presented to show its effects on others because the statement is not offered for the truth of the statement itself. *People v Knolton*, 86 Mich App 424, 429; 272 NW2d 669 (1978). Here, Naso's statements were admissible to show what actions the security team members took after learning that his vehicle was missing.

In short, viewed in a light most favorable to the prosecution, there was sufficient admissible evidence offered at trial to support defendant's convictions for UDAA, larceny in a building, and larceny of property valued at $1,000 or more, but less than $20,000.

## B. KNOWINGLY PROVIDING FALSE INFORMATION TO A PEACE OFFICER

Pursuant to MCL 750.479c(1)(b), "a person who is informed by a peace officer that he or she is conducting a criminal investigation shall not . . . [k]nowingly and willfully make any statement to the peace officer that the person knows is false or misleading regarding a material fact in that criminal investigation." The prosecution presented evidence that, upon his arrest, defendant was informed by two MSP detectives that they were conducting a criminal investigation regarding a stolen car. It is undisputed that defendant thereafter gave the detectives three false names. Defendant admitted as much during trial and acknowledged that the names were false. Defendant argues, however, that his name was not a material fact because the detectives could have conducted their investigation without it. We disagree. Defendant was the primary suspect in the investigation and both detectives and their sergeant testified that they needed to identify the person before they could continue with the investigation. Ultimately, the detectives were forced to engage the assistance of the Border Patrol to utilize its mobile biometric scanning machine to ascertain defendant's identity from his fingerprints. The evidence showed that, after ascertaining defendant's identity, the detectives could, in fact, continue their investigation by obtaining defendant's criminal history and other pertinent information, which they used during defendant's interview. Viewed in a light most favorable to the prosecution, the evidence was sufficient to enable the jury to find beyond a reasonable doubt that defendant knowingly provided false information regarding a material fact to a peace officer.

## C. DEFENDANT'S MOTION FOR A DIRECTED VERDICT

We also reject defendant's related argument that he is entitled to relief because the trial court relied on inadmissible hearsay from the MGM surveillance supervisor when denying his motion for a directed verdict on the theft offenses. Defendant cites the following excerpt from the trial court's ruling:

Here the Court has heard a number of witnesses who have testified for the prosecution, first being [the surveillance supervisor], who worked for surveillance for MGM Casino. *She testified that a report of a stolen vehicle was made*

-7-

*sometime after 7 P.M., on June 5, 2015* [sic]*. One of—a fellow security officer spoke to the owner of the vehicle who reported the car being stolen in the MGM parking lot.* [Emphasis added.]

First, reading the entirety of the trial court's ruling, and not just the selected portion provided by defendant, it is clear that the court relied on admissible evidence in denying defendant's motion for a direct verdict. Second, to the extent that the trial court considered inadmissible hearsay, our review of a trial court's decision on a motion for a directed verdict is de novo, *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006), and, as set forth in the preceding analysis, the evidence was sufficient to establish that defendant's taking of the van was nonconsensual. See *People v Lewis* (*On Remand* ), 287 Mich App 356, 365; 788 NW2d 461 (2010), vacated in part on other grounds 490 Mich 921 (2011) ("A challenge to the trial court's decision on a motion for a directed verdict has the same standard of review as a challenge to the sufficiency of the evidence."). Third, we disagree with defendant's claim that the above-referenced excerpt is inadmissible hearsay.

Hearsay, which is a statement other than one made by the declarant while testifying at the trial or hearing and is offered to prove the truth of the matter asserted, is inadmissible at trial unless there is a specific exception allowing its introduction. See MRE 801(c), MRE 802, and *People v Ivers*, 459 Mich 320, 331; 587 NW2d 10 (1998). The surveillance supervisor's statement was not offered to prove the truth of the matter asserted, i.e., for the purpose of establishing that Naso's vehicle was stolen. Rather, it was offered to provide context for understanding the course and chronology of the police investigation and the existence of the surveillance video recordings. The surveillance supervisor specifically testified that, as a result of receiving the call from the security officer, she pulled up live coverage, using the security camera near Naso's location, and also backtracked to save video from earlier surveillance video. "An out-of-court statement introduced to show its effect on a listener, as opposed to proving the truth of the matter asserted, does not constitute hearsay under MRE 801(c)." *People v Gaines*, 306 Mich App 289, 306-307; 856 NW2d 222 (2014). Indeed, in arguing against a directed verdict, the prosecutor did not use the statement to establish that defendant stole Naso's minivan. Because the statement was used for the limited purpose of providing context for the surveillance supervisor's actions, and not to prove the truth of the matter asserted, it did not constitute hearsay. In sum, the trial court did not err in denying defendant's motion for a directed verdict.

## III. PROSECUTORIAL MISCONDUCT

Defendant argues that he is entitled to a new trial because of the prosecutor's improper conduct in (1) using hearsay to establish lack of consent, and (2) introducing an inadmissible prior conviction for impeachment. We disagree. Because defendant did not object to the prosecutor's conduct at trial, this issue is unpreserved. We review unpreserved claims of prosecutorial misconduct for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 752-753, 763-764; 597 NW2d 130 (1999). "[P]rosecutorial misconduct cannot be predicated on good-faith efforts to admit evidence." *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999).

### A. USE OF HEARSAY EVIDENCE THAT THE VEHICLE WAS STOLEN

Although defendant asserts that the prosecutor acted in bad faith by repeatedly using hearsay statements that Naso's van was reported stolen to establish lack of consent, defendant fails to provide any citations to the record to identify the testimony that he contends constituted inadmissible hearsay. As previously discussed, the surveillance supervisor's statements regarding the van being stolen did not constitute hearsay under MRE 801(c). *Gaines*, 306 Mich App at 306-307. Within this claim, defendant argues that "the prosecutor compounded the error by arguing during closing argument that the evidence showed that Roy Naso's minivan had been stolen and taken without authority." In arguing lack of consent, the prosecutor stated:

> The third element; that the taking or driving away was done without authority. Now I ask you at the beginning of this trial during my opening statement to use your common sense throughout this trial, don't check your common sense at the door. Step back and look at this evidence, oaky. It's circumstantial, a lot of it, but that's okay. The judge will instruct you that circumstantial evidence or indirect evidence is fine.

> Just look at this. Roy Naso drives his minivan to the casino on June 4, 2014. A few hours later—and you can see him walk into the casino, right. You have his surveillance video of the doors with outside the elevator. He didn't sit in this van like the defendant claims. You can see him walk into the elevators and go into the casino. Few hours later, he comes back and his van's gone. You see the surveillance video of him standing out there with the security officer Kevin Snow where his van was parked and it's gone.

> Roy Naso makes a report to MGM security. They give him the general crime reporting phone number. Roy Naso goes home in a limousine in the middle of the night because his van is gone.

> The license plate from Roy Naso's van is put into MGM's License Plate[] Recognition software as a stolen motor vehicle. When [Naso's daughter] went to Roy Naso's home over the course of the next few weeks, she testified that her father's van was not there. And then [] Roy Naso's son-in-law, went with him to a tow yard a couple of weeks later to pick up a van. *That minivan was stolen. It was taken without authority.* [Emphasis added.]

Defendant does not explain how the prosecutor's argument was improper. Contrary to defendant's suggestion, the prosecutor did not rely on any hearsay statements from surveillance or security personnel to prove that defendant stole Naso's van. The prosecutor was free to argue the evidence and all reasonable inferences that arose from the evidence in relationship to his theory of the case, *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995), and was not limited to presenting his arguments in the blandest terms possible. *People v Meissner*, 294 Mich App 438, 456; 812 NW2d 37 (2011). The prosecutor's remarks are supported by the evidence adduced during trial, and the reasonable inferences arising from it. *Bahoda*, 448 Mich at 282. Therefore, the prosecutor's remarks during closing argument did not constitute misconduct.

## B. IMPEACHMENT EVIDENCE

Defendant argues that the prosecutor committed misconduct by eliciting evidence of defendant's prior conviction for breaking and entering a vehicle in the following exchange on cross-examination of defendant:

> *Q.* In 2011, you were convicted of breaking and entering a vehicle with damage to the vehicle; is that correct?
>
> *A.* That is correct.
>
> *Q.* That was in Wayne County?
>
> *A.* Yes.
>
> *Q.* Your Honor, I have nothing further.

A prior conviction may be used to impeach a witness's credibility if the conviction satisfies the criteria set forth in MRE 609. *People v Cross*, 202 Mich App 138, 146; 508 NW2d 144 (1993). MRE 609 governs impeachment of a witness with a prior conviction, and provides, in pertinent part:

> (a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime *shall not be admitted unless* the evidence has been elicited from the witness or established by public record during cross-examination, *and*
>
> * * *
>
> (2) the crime contained an element of theft, *and*
>
> (A) the crime was punishable by imprisonment in excess of one year or death under the law under which the witness was convicted, *and*
>
> (B) the court determines that the evidence has significant probative value on the issue of credibility and, if the witness is the defendant in a criminal trial, the court further determines that the probative value of the evidence outweighs its prejudicial effect.
>
> (b) Determining Probative Value and Prejudicial Effect. For purposes of the probative value determination required by subrule (a)(2)(B), the court shall consider only the age of the conviction and the degree to which a conviction of the crime is indicative of veracity. If a determination of prejudicial effect is required, the court shall consider only the conviction's similarity to the charged offense and the possible effects on the decisional process if admitting the evidence causes the defendant to elect not to testify. The court must articulate, on the record, the analysis of each factor. [Emphasis added.]

Here, the trial court did not perform the standard balancing test required under the court rule before the evidence of the prior conviction was entered. Assuming, without deciding, that

the trial court's failure to conduct a balancing test under MRE 609(a)(2)(B) was error, we still cannot find that it was error which results in reversal of defendant's convictions. Rather, our review of the record leads us to conclude that any presumed error did not deny defendant a fair trial as there was substantial other evidence of defendant's guilt. *Carines*, 460 Mich at 752-753, 763. Specifically, evidence showed that Naso parked his vehicle at the MGM parking garage. Later that evening, Naso's vehicle was missing. Although defendant claimed that he had permission to take the minivan, there was substantial evidence did not support defendant's version of events. A surveillance video showed an individual approach Naso's parked vehicle, leave the parked vehicle, and then approach the vehicle again. The vehicle was captured on video leaving the garage. A few days later, defendant drove the missing vehicle back to the MGM parking lot. A key fob for the minivan was in defendant's possession and a sweatshirt with defendant's DNA was inside the van. Additionally, testimony revealed that defendant provided false identification to the police in an attempt to conceal his true identity, which was probative of defendant's consciousness of guilt. *People v Unger*, 278 Mich App 240, 225-226; 749 NW2d 272 (2008). Also, after his arrest and after being apprised of his rights, defendant denied driving the minivan, which conflicted with his testimony at trial. Finally, Naso's family members testified that Naso never loaned his vehicle to anyone. On this record, even presuming an improper introduction of the prior conviction, this Court cannot conclude that by doing so the trial court denied defendant his substantial rights or deprive him of a fair trial. *Carines*, 460 Mich at 752-753, 763. Therefore, defendant is not entitled to a new trial.[2] *Id*.

## IV. DEFENDANT'S CUSTODIAL STATEMENTS

Defendant argues that the trial court erred in denying his motion to suppress his statements that were made before he was advised of his *Miranda*[3] rights. In specific, defendant contends that because the detectives' questions regarding his name, which led him to provide false names, related directly to his connection with evidence of other criminal activity—the offense of lying to a police officer—*Miranda* warnings were required. Defendant also argues that police asked him questions other than his identity that required *Miranda* warnings.

We review de novo a trial court's ultimate decision regarding a motion to suppress; however, factual findings are reviewed for clear error. *People v Williams*, 240 Mich App 316, 319; 614 NW2d 647 (2000). Constitutional issues are also reviewed de novo. *People v Fackelman*, 489 Mich 515, 524; 802 NW2d 552 (2011).

Both the Michigan Constitution and the United States Constitution guarantee the right against self-incrimination. US Const, Am V; Const 1963, art 1, § 17; *People v Cortez (On*

---

[2] Given our resolution of this issue, we also reject defendant's claim that the cumulative effect of the prosecutor's conduct requires reversal. Even if we are to presume error relative to this issue, this Court has held that a single error did not deny defendant a fair trial, "there can be no cumulative effect of errors meriting reversal." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007).

[3] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

*Remand)*, 299 Mich App 679, 691; 832 NW2d 1 (2013). To protect a defendant's privilege against self-incrimination, a suspect must be informed of certain rights before he is subjected to a custodial interrogation. *Miranda v Arizona*, 384 US 436, 444-445; 86 S Ct 1602; 16 L Ed 2d 694 (1966). "Interrogation, for purposes of *Miranda*, refers to express questioning and to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect." *People v Anderson*, 209 Mich App 527, 532-533; 531 NW2d 780 (1995).

Before trial, the prosecution filed a motion in limine to admit defendant's statements. At issue here are only the statements defendant made while he was in the holding cell, before he was given *Miranda* warnings. With regard to those statements, the prosecutor argued that the detectives were not required to provide *Miranda* warnings before asking defendant for his name and birthdate. Following the prosecution's motion, defendant moved to suppress his statements, but did not directly address the prosecutor's argument. At the evidentiary hearing, defendant did not testify. The MSP detectives who had contact with defendant—Det. Hlinka, Det. Keating, and Det. Sgt. Moore—were the only witnesses, and the videotaped recording of defendant in the holding cell was admitted.

After the testimony, the prosecutor argued that the detectives were not required to provide *Miranda* warnings before asking defendant routine booking questions, which included his name. In response, defense counsel argued that the detectives were required to given him *Miranda* warnings "before they asked him the second time what his name was."

The trial court denied defendant's motion to suppress, stating:

I believe that the state police had the right to ask the defendant what his name was. Under *Pennsylvania [v] Muniz*, [496 US 582; 110 S Ct 2638; 110 L Ed 2d 528 (1990)], the Supreme Court held that responses to questions regarding suspect's name, address, height, weight, eye color, date of birth and current age are exempt from the general rule set forth in *Mirand* [sic].

And notwithstanding defense counsel's position that once he gave a false name and was warned about the possibility of additional charges as a result of continuing to provide a false name, I don't think the rights set forth by the Supreme Court under *Pennsylvania [v] Muniz* are no longer in effect. That they have the right to continue to ask the defendant his name. If he chooses not to provide a correct name[,] that's on him.

At trial, the prosecution played an audio recording of the police officers' pre-*Miranda* interview with defendant. During the interview the officers ask defendant his name after he had given a false identity, police asked his birthdate, where he lived, whether there was a phone number to contact, whether defendant had been arrested before, whether defendant had a brother and what the brother's name and birthdate were, and whether defendant's brother was in prison and what the brother was in prison for. One of the officers then engaged in the following colloquy with defendant:

*Officer.* Okay. Anything you need to tell me before I leave?

*Defendant*. No. Who are you?

*Officer*. State Police.

*Defendant*. And you are asking me questions?

*Officer*. I am trying to find out who you are, who I'm talking to.

\* \* \*

*Defendant*. Now can you tell me why am I being detained?

*Officer*. Well I was told that you were driving a stolen vehicle.

*Defendant*. [] was I driving a stolen vehicle when I was walking up on deck two?

*Officer*. I'm telling you what they told me. Have you been here before; MGM? Is this your first time being at MGM?

*Defendant*. Not here. Yes.

*Officer*. Wait a minute. You've been here before?

*Defendant*. I been here.

*Officer*. When is the last time you were here?

*Defendant*. Long time ago.

*Officer*. What's a long time ago?

*Defendant*. Maybe three years.

*Officer*. So your last time that you were here was three years ago?

*Defendant*. Yes.

*Officer*. Okay. That's not the information I needed to know. You were here last week. You got a twin?

*Defendant*. No.

*Officer*. Okay. All right. Be right back. This is border patrol agent. We are gonna take you out, fingerprint you and find out who you are, okay? Okay? I don't think you want to tell us.

Defendant concedes that police were entitled to ask him his identity the first time. However, defendant argues that, after he provided false identity, subsequent questions about his

-13-

identity were intended to elicit incriminating information and therefore police should have provided *Miranda* warnings before the repeat questions about his identity.

*Miranda*'s safeguards apply not only to express questioning, "but also to its 'functional equivalent.'" *Muniz*, 496 US at 600, quoting *Arizona v Mauro*, 481 US 520, 526; 107 S Ct 1931; 95 L Ed 2d 458 (1987). However, the Court has carved-out a "routine booking question" exception to *Miranda*, "which exempts from *Miranda's* coverage questions to secure the biographical data necessary to complete booking or pretrial services," and that "appear reasonably related to the police's administrative concerns." *Muniz*, 496 US at 601-602 (quotation marks and citations omitted). These administrative questions may include inquiries about defendant's name, address, height, weight, eye color, date of birth, and current address. *Pennsylvania v Muniz*, 496 US 582, 601-602; 110 S Ct 2638; 110 L Ed 2d 528 (1990); see also *United States v Clark*, 982 F 2d 965, 968 (CA 6, 1993). "Thus, absent evidence that a defendant has particular susceptibility to the questioning or that the police used the booking questions to elicit incriminating statements from the defendant, routine biographical questions are not ordinarily considered interrogation." *Id*. This does not mean however that "any question asked during the booking process falls within" the booking exception. *Id*. at 601 n 14 (quotation marks omitted). Instead, "[w]ithout obtaining a waiver of the suspect's *Miranda* rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." *Id*. (quotation marks omitted).

With respect to the questions about identity, here, the questions fell within the booking exception to *Miranda*. Defendant responded and police attempted to verify the name that defendant provided, learning that it was a false identity, and then asked defendant again what his identity was. Defendant provided two more false identities to police after police confirmed that the names were false. The police officer's repeated questions concerning defendant's identity were questions related to the booking process and were "reasonably related to the police's administrative concerns." *Muniz*, 496 US at 601-602. Merely because defendant responded by providing a false identity does not serve to remove the administrative questions from the booking exception. Instead, the record supports the trial court's finding that the detectives merely asked defendant his name to ascertain his identity as a necessary part of the normal booking procedure. There is nothing in the record to support that police asked defendant his identity in an attempt to elicit an incriminating statement from defendant. *Id*. Instead, police simply asked defendant his name after defendant provided them with false information. The questioning was proper and it fell within the booking exception to *Miranda*. *Muniz*, 496 US at 600-601.

Defendant also argues that questions other than questions about his identity were impermissible and did not fall within the booking exception. Specifically, defendant cites the following questions that Detective Keating asked him before providing a *Miranda* warning:

Have you been here before: MGM? Is this your first time being at MGM? You're been here before? What's a long time ago? So the last time that you were here was three years ago?

Defendant correctly argues that the officers asked him questions that did not fall within the booking exception to *Miranda*. The questions about whether defendant was previously at the MGM were not administrative in nature, but rather were investigatory and related to whether

-14-

defendant was at the MGM at the time the larceny was committed. Additionally, questions concerning whether defendant had been previously arrested, whether defendant had a brother and whether the brother was in prison were not related to the officer's administrative concerns. Instead, the questions presented the potential that the jury would view defendant in a negative light and presume that he and his family had a criminal history. Similarly, the question "[a]nything you need to tell me before I leave?" was investigative in nature and not limited to the administrative process. Thus, the trial court erred in denying defendant's motion to suppress as to these questions. See *Muniz*, 496 US at 601 n 14 (quotation marks and citations omitted) (noting that, while booking questions may be permissible, this does not mean that "any question asked during the booking process falls within" the booking exception to *Miranda*). With regard to this preserved nonstructural constitutional error, in order to show that the error was harmless and that reversal is not required, the state must "prove, and the court [must] determine, beyond a reasonable doubt that there is no reasonable possibility that the evidence complained of might have contributed to the conviction." *People v Anderson (After Remand),* 446 Mich 392, 405-406; 521 NW2d 538 (1994) (citation and quotation marks omitted).

In this case, defendant's responses to the improper questions were not severely damaging to his case. With respect to the questions as to whether he had been at the MGM, defendant explained that he had not been to the MGM in quite some time. Then, at trial, defendant admitted that he had been at the MGM on the day that the vehicle disappeared. The response to police therefore undermined defendant's credibility at trial. With respect to the question regarding whether he had been arrested before, defendant replied that he had not and concerning the statements about his brother, defendant agreed that he had a brother who was incarcerated. However, there is no reasonable possibility that these questions and answers might have contributed to the convictions. *Anderson*, 446 Mich at 405-406. Other evidence at trial undermined defendant's credibility. After being advised of his *Miranda* rights, defendant denied having driven the minivan. Then, at trial, defendant acknowledged driving the minivan, but claimed that he had permission to take the vehicle. These conflicting version of events undermined defendant's credibility. In addition, the other evidence did not support the defense theory and there was substantial evidence of defendant's guilt. Here, video recording showed that Naso parked his vehicle at the MGM and then entered the casino. After the vehicle was parked and after Naso entered the building surveillance video recorded an individual approach the vehicle twice. The vehicle was then captured on video leaving the parking lot. Several hours later when Naso returned to where he parked the van, the vehicle was gone and Naso appeared nervous and worried that the vehicle was missing. Several days later, defendant drove the van back to the MGM. Defendant was apprehended and he had the keys to the minivan on his person and his sweatshirt was inside the vehicle. Although defendant argued that Naso gave him permission to borrow the van, Naso's family testified that Naso never allowed anyone to borrow the minivan and the other facts and circumstances do not support that defendant had permission to take the van. Based on this record, there is no reasonable probability that defendant's responses to the improper police questioning impacted the outcome of the trial. *Anderson*, 446 Mich at 405-406. Accordingly, defendant is not entitled to a new trial. *Id*.

In sum, the trial court did not err in denying defendant's motion to suppress with respect to the questions about defendant's identity. Although the court erred in admitting defendant's

responses to non-administrative questions, there is no reasonable probability that the error contributed to defendant's convictions. *Id.*

## V. DOUBLE JEOPARDY

Lastly, defendant argues that his convictions and sentences for both larceny of personal property valued at $1,000 or more, but less than $20,000, and larceny in a building violate the constitutional double jeopardy prohibition against multiple punishments for the same offense under *Blockburger v United States*, 284 US 299; 52 S Ct 180; 76 L Ed 306 (1932). Because defendant failed to raise this issue below, we review this unpreserved claim of constitutional error for plain error affecting defendant's substantial rights. *Carines*, 460 Mich 763; *People v Ackah-Essien*, 311 Mich App 13, 30-31; 874 NW2d 172 (2015).

The United States and Michigan Constitutions both protect against double jeopardy, which includes protection against multiple punishments for the same offense. US Const, Am V; Const 1963, art 1, § 15. The validity of multiple punishments is generally determined under the "same-elements test," which requires a reviewing court to examine multiple offenses to determine "whether each provision requires proof of a fact which the other does not." *People v Smith*, 478 Mich 292, 305, 315-316; 733 NW2d 351 (2007) (citation omitted). If the Legislature has clearly intended to impose multiple punishments, the imposition of multiple sentences is permissible regardless of whether the offenses have the same elements, but if the Legislature has not clearly expressed its intent, multiple offenses may be punished if each offense has an element that the other does not. *Id.* at 316. Neither the larceny of personal property statute, MCL 750.356, nor the larceny in a building statute, MCL 750.360, contain any language indicating that multiple punishments for the two offenses either were or were not intended. Therefore, it is proper to consider the elements of the two offenses.

The statute proscribing larceny of personal property valued at $1,000 or more but less than $20,000, MCL 750.356(1) and (3)(a), provides that [a] person who commits larceny by stealing any of the [listed] property of another person" is guilty of a felony if [t]he property stolen has a value of $1,000.00 or more but less than $20,000.00." As previously observed, to establish this offense, the prosecution must show: (1) the taking of someone else's property without consent, (2) movement of the property, (3) the specific intent to steal or permanently deprive the owner of the property, *Cain*, 238 Mich App at 120-121, and that the property had a value of $1,000 or more, but less than $20,000. MCL 750.356(3)(a).

The statute proscribing larceny in a building, MCL 750.360, provides that "[a]ny person who shall commit the crime of larceny by stealing in any dwelling house, house trailer, office, store, gasoline service station, shop, warehouse, mill, factory, hotel, school, barn, granary, ship, boat, vessel, church, house of worship, locker room or any building used by the public shall be guilty of a felony." Again, to establish larceny in a building, the prosecution must show: (1) an actual or constructive taking of goods or property, (2) a carrying away or asportation, (3) the carrying away must be with felonious intent, (4) the goods or property must be the personal property of another, (5) the taking must be without the consent and against the will of the owner, and (6) the taking must occur within the confines of the building. *Sykes*, 229 Mich App at 278.

A comparison of the elements of larceny of personal property valued at $1,000 or more but less than $20,000, and larceny in a building reveal that each offense has an element that the other does not. Larceny in a building requires evidence that the taking occurred within the confines of a building, which is not a requirement of larceny of personal property. Additionally, larceny of personal property requires evidence that the stolen property has a certain value, whereas larceny in a building does not. Because each offense has an element that the other does not, defendant's convictions of both larceny of personal property and larceny in a building do not violate the double jeopardy protection against multiple punishments for the same offense. *Smith*, 478 Mich at 315-316.

Defendant cites *People v Longuemire*, 77 Mich App 17; 257 NW2d 273 (1977) to support that convictions of both larceny of personal property and larceny in a building violate the double jeopardy clause. In *Longuemire*, this Court held as follows:

> We take notice sua sponte, however, that on the facts of this case the conviction for larceny of property in excess of $100 necessarily included the crime of larceny in a building. The same conduct violated both laws. The defendant cannot be twice punished for the same offense. [*Id*. at 24.]

Although this language supports defendant's argument, *Longuemire* is not controlling in this case. Initially we note that *Longuemire* was decided before November 1, 1990 and therefore it is not binding precedent. MCR 7.215(J)(1). More importantly, as noted above, the test set forth in *Blockburger*, 284 US at 299, governs whether convictions of two offenses violates the Double Jeopardy Clause. *Smith*, 478 Mich at 305. The *Longuemire* Court did not apply the *Blockburger* test and instead, without discussion, summarily held that the two offenses violated the Double Jeopardy Clause. As discussed above, applying the *Blockburger* test indicates that larceny and larceny in a building both contain a separate and distinct element; therefore, defendant's convictions did not violate the Double Jeopardy Clause. *Smith*, 478 Mich at 315-316.

Affirmed.

/s/ Michael J. Kelly
/s/ Christopher M. Murray
/s/ Stephen L. Borrello